# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**Case No.:** _____

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,

        Plaintiffs,

vs.

JOSE DEJESUS GOMEZ-CORTES, M.D., FERNANDEZ MEDICAL SERVICES, INC., MADAY FERNANDEZ, PAIN RELIEF CLINIC OF HOMESTEAD CORP., LESYANI MARTINEZ, L.M.T., DANIEL COLLAZO LOPEZ, HEALTH AND WELLNESS SERVICES INC., ANDRELVIS PEREZ, MANUEL ALEJANDRO FRANCO, M.D., WELLNESS HEALTHCARE CLINIC CORP., JOSE RAMON CABRERA, TAMARA Y. HERNANDEZ, NESTOR FERNANDEZ, M.D., RESTORATIVE THERAPY CENTER INC., RANDY DIAZ, SERGIO CASTELLANOS, YURITZA HERNANDEZ GOMEZ, L.M.T., MAYULYS M. GALLO, L.M.T., GLOBAL CARE SERVICES INC., SILVIO MICHEL MESTRE DREKE, ARMANDO DE FERIA, M.D., MARIO LOPEZ, L.M.T., DOCTOR MAX MEDICAL CENTER CORP., ADRIAN HERNANDEZ ALEMAN, IRENE CABRERA, JACQUELINE LEVA, M.D., PEDRO HERRERA VILLAFRANCA, L.M.T., JORGE SIMON ROQUE, L.M.T., PALMETTO HEALTH MEDICAL CENTER CORP., and MARTHA I. TORRES, L.M.T.,

        Defendants.

_____/

**Jury Trial Demand**

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows:

1.      This action seeks to recover more than $7,000,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Fernandez Medical Services Inc. f/k/a Pacific Health Rehabilitation, Inc. ("Fernandez Medical), Pain Relief Clinic of Homestead Corp. ("Pain Relief Clinic"), Health and Wellness Services Inc. ("Health and Wellness"), Wellness Healthcare Clinic Corp. ("Wellness Healthcare"), Restorative Therapy Center Inc. ("Restorative Therapy"), Global Care Services Inc. ("Global Care"), Doctor Max Medical Center Corp. ("Doctor Max"), and Palmetto Health Medical Center Corp. ("Palmetto Health")(collectively the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow up examinations, and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that Defendants have submitted or caused to be submitted through the Clinic Defendants, because:

(i)      at all relevant times, the Clinic Defendants operated in violation of the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect PIP benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-

determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(iv)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed  – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services in question;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO

3.      As set forth below, Defendants at all relevant times have known that:

(i)     the Clinic Defendants operated in violation of the licensing and operating requirements set forth in the Clinic Act, rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)    the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)   in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by unsupervised massage therapists and massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists and massage therapists;

(iv)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services without supervision;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

4.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Clinic Defendants.

5.      The charts annexed hereto as Exhibits "1" – "8" set forth large, representative samples of the fraudulent claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO.

6.      Defendants' interrelated fraudulent schemes began no later than 2013 and have continued uninterrupted since that time.  As a result of Defendants' fraudulent schemes, GEICO has incurred damages of more than $7,000,000.00.

**I.     Plaintiffs**

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

**II.    Defendants**

8.      Defendant Jose DeJesus Gomez-Cortes, M.D. ("Gomez-Cortes") resides in and is a citizen of Florida. Gomez-Cortes was licensed to practice medicine in Florida on February 26, 1987. Gomez-Cortes falsely purported to serve as medical director at Fernandez Medical, Pain Relief Clinic, Wellness Healthcare, and Palmetto Health, and purported to perform many of the Fraudulent Services on behalf of the Clinic Defendants.

9.       Defendant Manuel Alejandro Franco, M.D. ("Franco") resides in and is a citizen of Florida. Franco was licensed to practice medicine in Florida on August 15, 1989. Franco falsely purported to serve as medical director at Health and Wellness and at Restorative Therapy.

10.      Defendant Nestor Fernandez, M.D. ("N. Fernandez") resides in and is a citizen of Florida. N. Fernandez was licensed to practice medicine in Florida on April 24, 1989. N. Fernandez falsely purported to serve as medical director at Wellness Healthcare.

11.      Defendant Armando De Feria, M.D. ("De Feria") resides in and is a citizen of Florida. De Feria was licensed to practice medicine in Florida on July 1, 1996. De Feria falsely purported to serve as medical director at Global Care.

12.      Defendant Jacqueline Leva, M.D. ("Leva") resides in and is a citizen of Florida. Leva was licensed to practice medicine in Florida on July 28, 2017, and falsely purported to serve as medical director at Doctor Max.

13.      Defendant Fernandez Medical is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Fernandez Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Fernandez Medical was incorporated in Florida on or about April 11, 2006. Fernandez Medical falsely purported to have Gomez-Cortes as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

14.      Defendant Maday Fernandez ("M. Fernandez") resides in and is a citizen of Florida. M. Fernandez purported to own and control Fernandez Medical, and used Fernandez Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

15. Defendant Lesyani Martinez, L.M.T. ("Martinez") resides in and is a citizen of Florida. Martinez was licensed to practice massage therapy in Florida on June 13, 2006, and purported to perform many of the Fraudulent Services on behalf of Fernandez Medical.

16. Defendant Pain Relief Clinic is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Pain Relief Clinic falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Pain Relief Clinic was incorporated in Florida on or about May 11, 2010. Pain Relief Clinic falsely purported to have Gomez-Cortes as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

17. Defendant Daniel Collazo Lopez ("Collazo") resides in and is a citizen of Florida. Collazo purported to own and control Pain Relief Clinic, and used Pain Relief Clinic as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

18. Defendant Health and Wellness is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Health and Wellness falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Health and Wellness was incorporated in Florida on or about June 29, 2007. Health and Wellness falsely purported to have Franco as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

19. Defendant Andrelvis Perez ("Perez") resides in and is a citizen of Florida. Perez purported to own and control Health and Wellness, and used Health and Wellness as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

20. Defendant Wellness Healthcare is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Wellness Healthcare falsely purported to be a

properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Wellness Healthcare was incorporated in Florida on or about March 9, 2016. Wellness Healthcare was purportedly owned and controlled by Jose Ramon Cabrera ("J. Cabrera") between March 2016 and September 2017, and then by Tamara Y. Hernandez (T. Hernandez") between September 2017 and June 2019. Wellness Healthcare falsely purported to have Gomez-Cortes and N. Fernandez as its medical directors, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

21.     Defendant J. Cabrera resides in and is a citizen of Florida. J. Cabrera purported to own and control Wellness Healthcare, and used Wellness Healthcare as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers

22.     Defendant T. Hernandez resides in and is a citizen of Florida. T. Hernandez purported to own and control Wellness Healthcare, and used Wellness Healthcare as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

23.     Defendant Restorative Therapy is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Restorative Therapy falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Restorative Therapy was incorporated in Florida on or about July 8, 2015, purported to be owned and controlled by Randy Diaz ("R. Diaz") between February 2016 and January 2019, and by Sergio Castellanos ("Castellanos") between December 2018 and the present. Restorative Therapy falsely purported to have Franco as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

24.     Defendant R. Diaz resides in and is a citizen of Florida. R. Diaz purported to own and control Restorative Therapy, and used Restorative Therapy as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

25.     Defendant Castellanos resides in and is a citizen of Florida. Castellanos purported to own and control Restorative Therapy, and used Restorative Therapy as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

26.     Defendant Yuritza Hernandez Gomez, L.M.T. ("Y. Hernandez") resides in and is a citizen of Florida. Y. Hernandez was licensed to practice massage therapy in Florida on May 18, 2011, and purported to perform many of the Fraudulent Services on behalf of Restorative Therapy.

27.     Defendant Mayulys M. Gallo ("Gallo") resides in and is a citizen of Florida. Gallo was licensed to practice massage therapy in Florida on September 14, 2011, 2011, and purported to perform many of the Fraudulent Services on behalf of Restorative Therapy.

28.     Defendant Global Care is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Global Care falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Global Care was incorporated in Florida on or about November 22, 2016, was owned and controlled by Silvio Michel Mestre Dreke ("Dreke"), falsely purported to have De Feria as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

29.     Defendant Dreke resides in and is a citizen of Florida. Dreke purported to own and control Global Care, and used Global Care as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

30.     Defendant Mario Lopez, L.M.T. ("M. Lopez") resides in and is a citizen of Florida. M. Lopez was licensed to practice massage therapy in Florida on March 4, 2014, and purported to perform many of the Fraudulent Services on behalf of Global Care and Doctor Max.

31.     Defendant Doctor Max is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Doctor Max falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Doctor Max was incorporated in Florida on or about January 25, 2016, was purportedly owned and controlled by Adrian Hernandez Aleman ("Aleman") between January 2016 and present, and by Irene Cabrera ("I. Cabrera") between February 2018 and present. Doctor Max falsely purported to have Leva as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

32.     Defendant Aleman resides in and is a citizen of Florida. Aleman purported to own and control Doctor Max, and used Doctor Max as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers. Aleman also owned and controlled Palmetto Health and used Palmetto Health as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers

33.     Defendant I. Cabrera resides in and is a citizen of Florida. I. Cabrera purported to own and control Doctor Max, and used Doctor Max as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

34.     Defendant Pedro Herrera Villafranca, L.M.T. ("Herrera") resides in and is a citizen of Florida. Herrera was licensed to practice massage therapy in Florida on March 29, 2017, and purported to perform many of the Fraudulent Services on behalf of Doctor Max.

35.     Defendant Jorge Simon Roque, L.M.T. ("Simon") resides in and is a citizen of Florida. Simon was licensed to practice massage therapy in Florida on January 31, 2017, and purported to perform many of the Fraudulent Services on behalf of Doctor Max and Palmetto Health.

36.     Defendant Palmetto Health a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Palmetto Health falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Palmetto Health was incorporated in Florida on or about January 19, 2018, was owned and controlled by Aleman, falsely purported to have Gomez-Cortes as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

37.     Defendant Martha I. Torres. L.M.T. ("Torres") resides in and is a citizen of Florida. Torres was licensed to practice massage therapy in Florida on February 4, 2015, and purported to perform many of the Fraudulent Services on behalf of Palmetto Health.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

39.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") ACT).

40.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

41.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

**I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.      The Florida No-Fault Law**

42.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

43.     Under the No Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.      No-Fault Reimbursement and Compliance with Florida Law Governing Health Care Practice**

44.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

45.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state

and federal law related to the provision of medical services or treatment." <u>See</u> Fla. Stat. §
627.732.

46.     Thus, health care services providers, including clinics licensed under the Clinic
Act, may not recover PIP Benefits for health care services that were not provided in substantial
compliance with all relevant applicable criminal, civil, and administrative requirements of
Florida and federal law related to the provision of the underlying services or treatment.

47.     By extension, insurers such as GEICO are not required to make any payments of
PIP Benefits for health care services that were not provided in substantial compliance with all
relevant applicable criminal, civil, and administrative requirements of Florida and federal law
related to the provision of the underlying services or treatment.

**C.     No-Fault Reimbursement and the Clinic Act**

48.     Subject to certain limited exceptions that are not applicable in this case, the Clinic
Act defines "clinic" to mean "an entity where health care services are provided to individuals
and which tenders charges for reimbursement for such services, including a mobile clinic and a
portable equipment provider." <u>See</u> Fla. Stat. § 400.9905.

49.     Pursuant to the Clinic Act, clinics operating in Florida must – among other things
– "appoint a medical director or clinic director who shall agree in writing to accept legal
responsibility for [certain enumerated] activities on behalf of the clinic." <u>See</u> Fla. Stat. §
400.9935(1).

50.     Among other things, a clinic medical director must "[c]onduct systematic reviews
of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an
unlawful charge, the medical director or clinic director shall take immediate corrective action."
<u>See</u> Fla. Stat. § 400.9935(1).

51.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

52.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

53.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

54.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director or other requirements, whether or not the underlying health care services were medically necessary or actually provided.

**D.     No-Fault Reimbursement and Medical Necessity**

55.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. Concomitantly, a health

care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

56.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**E.     No-Fault Reimbursement, Massage Therapy, and Massage Therapists**

57.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics organized under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

58.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.").

59.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services provided by massage therapists in response to widespread PIP fraud involving

massage services and massage therapists. <u>See</u>, <u>e.g.</u>, Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

60.     Pursuant to Fla. Stat. § 486.028, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

**F.     No-Fault Billing and No-Fault Reimbursement**

61.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     For any service or treatment that was not lawful at the time rendered;

(ii)    For any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(iii)   To any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iv)    With respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

<u>See</u> Fla. Stat. § 627.736.

62.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. <u>See</u> Fla. Stat. § 627.736.

## II.     Defendants' Interrelated Fraudulent Schemes

63.     As set forth below, Defendants masterminded and implemented a series of interrelated fraudulent schemes in which they billed GEICO, or caused GEICO to be billed, more than $7,000,000.00 for medically unnecessary, illusory, and otherwise non-reimbursable services.

## A.     The Fraudulent Operation of the Clinic Defendants Without Legitimate Medical Directors

64.     Because the Clinic Defendants were subject to the Clinic Act, M. Fernandez, Collazo, Perez, J. Cabrera, T. Hernandez, R. Diaz, Castellanos, Dreke, I. Cabrera, and Aleman (collectively the "Clinic Owner Defendants") could not operate the Clinic Defendants unless licensed physicians were employed as the Clinic Defendants' medical directors. However, if the Clinic Owner Defendants retained legitimate physicians to serve as the Clinic Defendants' medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director, which would impede the Defendants' interrelated schemes.

65.     Accordingly:

(i)     M. Fernandez recruited Gomez-Cortes, a licensed physician, who was willing to falsely pose as the legitimate medical director at Fernandez Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director.

(ii)    Collazo recruited Gomez-Cortes, a licensed physician, who was willing to falsely pose as the legitimate medical director at Pain Relief Clinic, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director.

(iii)   Perez retained Franco, a licensed physician, who was willing to falsely pose as the legitimate medical director at Health and Wellness, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director.

(iv)     J. Cabrera recruited Gomez-Cortes, a licensed physician, who was willing to falsely pose as the legitimate medical director at Wellness Healthcare, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director. Thereafter, T. Hernandez retained Gomez-Cortes to continue to pose as Wellness Healthcare's phony medical director. Later, T. Hernandez recruited N. Fernandez, a licensed physician, who was willing to falsely pose as the legitimate medical director at Wellness Healthcare, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director.

(v)     R. Diaz retained Franco, a licensed physician, who was willing to falsely pose as the legitimate medical director at Restorative Therapy, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director. Thereafter, Castellanos retained Franco to continue to pose to pose as Restorative Therapy's phony medical director

(vi)     Dreke recruited De Feria, a licensed physician, who was willing to falsely pose as the legitimate medical director at Global Care, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director.

(vii)     Aleman and I. Cabrera recruited Leva, a licensed physician, who was willing to falsely pose as the legitimate medical director at Doctor Max, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director.

(viii)     Aleman recruited Gomez-Cortes, a licensed physician, who was willing to falsely pose as the legitimate medical director at Palmetto Health, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director.

66.     In fact, Gomez-Cortes, Franco, N. Fernandez, De Feria, and Leva (collectively the "Clinic Medical Director Defendants") were never genuine medical directors for the Clinic Defendants. Instead, from the beginning of each of their associations with the respective Clinic Defendants, they ceded all day-to-day decision-making and oversight regarding health care services to the respective Clinic Owner Defendants and their associates.

67.     In fact, the only thing that Clinic Medical Director Defendants did during their phony tenures as medical directors was to occasionally sign bills and treatment reports prepared

by other of the respective Clinic Defendants' personnel, at their respective Clinic Owner Defendants' direction.

68.     In keeping with the fact that Clinic Medical Director Defendants were never genuine medical directors for the Clinic Defendants:

(i)     The Clinic Medical Director Defendants never legitimately conducted systematic reviews of the Clinic Defendants' billings to ensure that the billings were not fraudulent or unlawful, and instead permitted the Clinic Defendants and Clinic Owner Defendants to misrepresent the identities of the treating providers, bill for illusory services, misrepresent the nature, extent, and results of patient examinations, and bill for "physical therapy" services that were performed by unsupervised masseuses.

(ii)    The Clinic Medical Director Defendants never legitimately ensured that all health care practitioners at the Clinic Defendants had active appropriate certification or licensure for the level of care being provided, and instead permitted unsupervised masseuses to purport to perform "physical therapy" on behalf of the Clinic Defendants.

69.     In the claims identified in Exhibits "1" – "8", the Clinic Defendants and Clinic Owner Defendants falsely represented that the Clinic Defendants were in compliance with the Clinic Act and eligible to receive PIP reimbursement. In fact, the Clinic Defendants were not in compliance with the Clinic Act, and were not eligible to receive PIP reimbursement.

**B.      The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at the Clinic Defendants**

70.     In keeping with the fact that the Clinic Medical Director Defendants never truly served as medical directors at the Clinic Defendants and never fulfilled the statutory obligations of a clinic medical director at the Clinic Defendants, the Clinical Medical Director Defendants permitted the Clinic Defendants to routinely falsely represent the identities of the health care providers who rendered services at the Clinic Defendants, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

71.    The Clinic Owner Defendants, Clinic Defendants, and the Clinic Medical Director Defendants billed for a limited range of health care services through the respective Clinic Defendants, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hot/cold packs, mechanical traction, paraffin bath, infrared therapy, ultrasound therapy, neuromuscular reeducation, therapeutic exercises, manual therapy, and electrical stimulation.

72.    As set forth in Exhibits "1" – "8", the purported physical therapy services constituted the vast majority of the services that were billed through the Clinic Defendants to GEICO.

73.    Gomez-Cortes was between approximately 62 and 70 years old during the period from 2013 to the present when he falsely purported to serve as "medical director" at Fernandez Medical, Pain Relief Clinic, Wellness Healthcare, and Palmetto Health.

74.    During his tenure as the purported "medical director" at each of Fernandez Medical, Pain Relief Clinic, Wellness Healthcare, and Palmetto Health, Gomez-Cortes also purported to personally perform or directly supervise a massive amount of medical services for all of the Clinic Defendants.

75.    As a result, Gomez-Cortes was only occasionally physically present at each of the Clinic Defendants, and did not personally perform – or even directly supervise – the massive amount of physical therapy services that the Clinic Defendants purported to provide to GEICO Insureds.

76.    Indeed, during his tenure as the purported "medical director" at each of Fernandez Medical, Pain Relief Clinic, Wellness Healthcare, and Palmetto Health, Gomez-Cortes only visited the clinics sporadically to purport to conduct initial and follow-up patient examinations –

to the extent the examinations were performed at all – and to sign bills and treatment reports prepared by the Clinic Defendants' personnel, at direction of the Clinic Owner Defendants.

77.    Even when Gomez-Cortes was physically present at the Clinic Defendants, he never provided, supervised, ordered, or prescribed the physical therapy services purportedly provided by the Clinic Defendants' to GEICO Insureds.

78.    All of the physical therapy services that the Clinic Defendants purported to provide between 2013 and the present were performed by massage therapists or unlicensed individuals associated with the Clinic Defendants, who reported directly to their respective Clinic Owner Defendants without any legitimate supervision or oversight by Gomez-Cortes or any other licensed physician or physical therapist.

79.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

80.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

81.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

82.     Martinez was a licensed massage therapist at Fernandez Medical.

83.     Y. Hernandez and Gallo were licensed massage therapists at Restorative Therapy.

84.     Herrera, Simon, and M. Lopez were licensed massage therapists at Doctor Max.

85.     Simon and Torres were licensed massage therapists at Palmetto Health.

86.     The Clinic Defendants were well-aware of the fact that they could not legally recover PIP Benefits for services provided by unsupervised massage therapists such as Martinez, Y. Hernandez, Gallo, M. Lopez, Herrera, Simon, and Torres (collectively, the "Massage Therapist Defendants") and other massage therapists or unlicensed individuals.

87.     In keeping with the fact that the Clinic Defendants knew that they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, in 2013 the Clinic Defendants began to list Gomez-Cortes as the treating provider on the substantial majority of the bills submitted to GEICO for the services that the Clinic Defendants purported to provide to GEICO Insureds, including most of the individual physical therapy services that were billed through the Clinic Defendants to GEICO.

88.     Considering his relatively advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than four health care clinics and to perform a massive number of individual health care services at numerous health care practices throughout the Miami area, Gomez-Cortes could not physically have performed, or even directly supervised, the massive number of physical therapy services that were billed through the Clinic Defendants GEICO between 2013 and the present.

89.     Even so, the Clinic Owner Defendants, Clinic Defendants, and Clinic Medical Director Defendants routinely falsely represented, in the billing they submitted or caused to be submitted through the Clinic Defendants, respectively, to GEICO for physical therapy services

between 2013 and the present, that Gomez-Cortes personally performed, or at least directly supervised, the underlying physical therapy services.

90.    For example:

(i)    On June 28, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes purported to provide at least 27 individual physical therapy services to at least 5 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination, one 15-minute patient examination, and 11 five-minute examinations that were performed on 11 additional GEICO Insureds at Atlantic Medical, Health and Wellness, Pacific Health, and Pain Relief Clinic; and (b) at least 72 additional physical therapy services purportedly provided to at least 26 additional GEICO Insureds at Atlantic Medical, Health and Wellness, and Pain Relief Clinic, including at least 12 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 16.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on June 28, 2016.

(ii)    On August 15, 2016, Wellness Healthcare, J. Cabrera, and Gomez-Cortes purported to provide at least 23 individual physical therapy services to at least 3 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) 15 five-minute examinations that were performed on 13 additional GEICO Insureds at Atlantic Medical, Health and Wellness, and Pain Relief Clinic; and (b) at least 128 additional physical therapy services purportedly provided to at least 22 additional GEICO Insureds at Atlantic Medical, Health and Wellness, Pain Relief Clinic, and Restorative Therapy, including at least 18.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on August 15, 2016.

(iii)    On December 6, 2016, Pain Relief Clinic, Collazo, and Gomez-Cortes purported to provide at least 15 individual physical therapy services to at least 4 individual

Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination, one 25-minute patient examination, one 15-minute examination, and 19 five-minute examinations that were performed on 20 additional GEICO Insureds at Fernandez Medical, Health and Wellness and Restorative Therapy; and (b) at least 68 additional physical therapy services purportedly provided to at least 20 additional GEICO Insureds at Fernandez Medical, Health and Wellness, Restorative Therapy, and Wellness Healthcare, including at least 17 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.5 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on December 6, 2016.

(iv)     On March 1, 2017, Global Care, De Feria, Dreke, and Gomez-Cortes purported to provide at least 12 individual physical therapy services to at least 2 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 25-minute patient examination, two 15-minute patient examination, and 23 five-minute that were performed on 22 additional GEICO Insureds at Health and Wellness, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare; and (b) at least 138 additional physical therapy services purportedly provided to at least 22 additional GEICO Insureds at Health and Wellness, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare, including at least 18.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on March 1, 2017.

(v)      On June 6, 2017, Health and Wellness, Perez, Franco, and Gomez-Cortes purported to provide at least 24 individual physical therapy services to at least 4 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) two 15-minute patient examinations, and 18 five-minute

examinations that were performed on 18 <u>additional</u> GEICO Insureds at Global Care, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare; and (b) at least 112 <u>additional</u> physical therapy services purportedly provided to at least 20 <u>additional</u> GEICO Insureds at Fernandez Medical, Global Care, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare, including at least 16 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on June 6, 2017

(vi)     On July 18, 2017, Pain Relief Clinic, Collazo, and Gomez-Cortes purported to provide at least 37 individual physical therapy services to at least 6 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.00 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) three 15-minute new patient examination, and 17 five-minute examinations that were performed on 17 <u>additional</u> GEICO Insureds at Global Care, Health and Wellness, and Restorative Therapy; and (b) at least 101 <u>additional</u> physical therapy services purportedly provided to at least 17 <u>additional</u> GEICO Insureds at Global Care, Health and Wellness, Restorative Therapy, and Wellness Healthcare, including at least 15.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on July 18, 2017.

(vii)    On August 8, 2017, Health and Wellness, Perez, Franco, and Gomez-Cortes purported to provide at least 36 individual physical therapy services to at least 6 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) 18 five-minute examinations that were performed on 18 <u>additional</u> GEICO Insureds at Atlantic Medical, Global Care, Pain Relief Clinic, and Restorative Therapy; and (b) at least 111 <u>additional</u> physical therapy services purportedly provided to at least 18 <u>additional</u> GEICO Insureds at Doctor Max, Pain Relief, Restorative Therapy, and Wellness Healthcare, including at least 19.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on August 8, 2017.

(viii)   On October 3, 2017, Global Care, De Feria, Dreke, and Gomez-Cortes purported to provide at least 31 individual physical therapy services to at least 5 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination, three 15-minute examinations  and 25 five-minute examinations that were performed on 25 additional GEICO Insureds at Atlantic Medical, Health and Wellness, Pain Relief, and Wellness Healthcare; and (b) at least 162 additional physical therapy services purportedly provided to at least 27 additional GEICO Insureds at Atlantic Medical, Fernandez Medical, Health and Wellness, Pain Relief Clinic, and Wellness Healthcare, including at least 26.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 34.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on October 3, 2017.

(ix)   On October 17, 2017, Health and Wellness, Perez, Franco, and Gomez-Cortes purported to provide at least 72 individual physical therapy services to at least 1 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) 22 five-minute examinations that were performed on 22 additional GEICO Insureds at Atlantic Medical, Global Care, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare; and (b) at least 143 additional physical therapy services purportedly provided to at least 24 additional GEICO Insureds at Atlantic Medical, Fernandez Medical, Global Care, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare, including at least 21.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 35 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on October 17, 2017.

(x)   On October 23, 2017, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes purported to provide at least 24 individual physical therapy services to at least 2 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact

between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) two 45-minute new patient examinations, one 15-minute patient examinations, and 24 five-minute examinations that were performed on 24 <u>additional</u> GEICO Insureds at A & J Rehab Center, Global Care, Health and Wellness, Pain Relief Clinic, and Wellness Healthcare; and (b) at least 223 <u>additional</u> physical therapy services purportedly provided to at least 32 <u>additional</u> GEICO Insureds at A & J Rehab Center, Fernandez Medical, Global Care, Health and Wellness, Pain Relief Clinic, and Wellness Healthcare, including at least 31 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 40 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on October 23, 2017.

(xi)     On November 28, 2017, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes purported to provide at least 36 individual physical therapy services to at least 6 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 45-minute new patient examination, one 30-minute new patient examination, three 15-minute examinations  and 17 five-minute examinations that were performed on 20 <u>additional</u> GEICO Insureds at Global Care, Health and Wellness, Pain Relief, and Wellness Healthcare; and (b) at least 137 <u>additional</u> physical therapy services purportedly provided to at least 23 <u>additional</u> GEICO Insureds at Care Services of Rehab Inc., Fernandez Medical, Global Care, Health and Wellness, Pain Relief Clinic, Wellness Healthcare, including at least 22 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 32.5 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on November 28, 2017.

(xii)    On January 10, 2018, Pain Relief Clinic, Collazo, and Gomez-purported to provide at least 42 individual physical therapy services to at least 6 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 15-minute patient examination, and 14 five-minute examinations that were performed on 14 <u>additional</u> GEICO Insureds at Doctor Max, Global Care,

Restorative Therapy, and Wellness Healthcare; and (b) at least 142 <u>additional</u> physical therapy services purportedly provided to at least 20 <u>additional</u> GEICO Insureds at Doctor Max, Global Care, Health and Wellness, Restorative Therapy, and Wellness Healthcare, including at least 23 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30.75 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on January 10, 2018.

(xiii)   On February 12, 2018, Health and Wellness, Perez, Franco, and Gomez-Cortes purported to provide at least 43 individual physical therapy services to at least 7 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 25-minute patient examination, one 15-minute patient examination, and 32 five-minute examinations that were performed on 30 <u>additional</u> GEICO Insureds at Doctor Max, Global Care, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare; and (b) at least 230 <u>additional</u> physical therapy services purportedly provided to at least 35 <u>additional</u> GEICO Insureds at A & J Rehab, Atlantic Medical, Doctor Max, Fernandez Medical, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare, including at least 38.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 48 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on February 12, 2018.

(xiv)   On February 13, 2018, Pain Relief Clinic, Collazo, and Gomez-Cortes purported to provide at least 36 individual physical therapy services to at least 5 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 45-minute new patient examination, one 25-minute examination, three 15-minute examination, and 25 five-minute examinations that were performed on 27 <u>additional</u> GEICO Insureds at Doctor Max, Global Care, Health and Wellness, Restorative Therapy, and Wellness Healthcare; and (b) at least 216 <u>additional</u> physical therapy services purportedly provided to at least 34 <u>additional</u> GEICO Insureds at Doctor Max, Global Care, Pain Relief, Palmetto Health, Restorative Therapy, and Wellness Healthcare, including at least 34.25 hours of physical therapy services that required direct, one-on-one patient contact between the

treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 43.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on February 13, 2018.

(xv)     On March 5, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes purported to provide at least 25 individual physical therapy services to at least 3 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) two 25-minute patient examinations, and 13 five-minute examinations that were performed on 18 additional GEICO Insureds at Global Care, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare; and (b) at least 157 additional physical therapy services purportedly provided to at least 25 additional GEICO Insureds at A & J Rehab Center, Atlantic Medical, Global Care, Health and Wellness, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare, including at least 26 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 31 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on March 5, 2018.

(xvi)    On April 6, 2018, Wellness Healthcare, T. Hernandez, and Gomez-Cortes purported to provide at least 12 individual physical therapy services to at least 2 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) ten five-minute examinations that were performed on 10 additional GEICO Insureds at Doctor Max, Global Care, Pain Relief Clinic, and Restorative Therapy, and; and (b) at least 95 additional physical therapy services purportedly provided to at least 16 additional GEICO Insureds at Doctor Max, Global Care, Pain Relief Clinic, Health and Wellness, and Restorative Therapy, including at least 15.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 17.75 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on April 6, 2018.

(xvii)   On April 12, 2018, Global Care, De Feria, Dreke, and Gomez-Cortes purported to provide at least 6 individual physical therapy services to at least 1 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes

personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1 hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) two 25-minute examinations, two 15-minute examinations, and 10 five-minute examinations that were performed on 14 additional GEICO Insureds at Doctor Max, Health and Wellness, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare; and (b) at least 150 additional physical therapy services purportedly provided to at least 24 additional GEICO Insureds at Atlantic Medical, A & J Rehab Center, Doctor Max, Fernandez Medical, Health and Wellness, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare, including at least 22.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.75 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on April 12, 2018.

(xviii)  On May 16, 2018, Palmetto Health, Aleman, and Gomez-Cortes purported to provide at least 12 individual physical therapy services to at least 2 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) two 30-minute new patient examinations, one 25-minute patient examination, and 19 five-minute examinations that were performed on 22 additional GEICO Insureds at Doctor Max, Global Care, Health and Wellness, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare; and (b) at least 162 additional physical therapy services purportedly provided to at least 27 additional GEICO Insureds at Doctor Max, Global Care, Health and Wellness, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare, including at least 24.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.5 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on May 16, 2018.

(xix)  On May 24, 2018, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes purported to provide at least 47 individual physical therapy services to at least 8 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) two 15-minute examinations, and 19 five-minute examinations that

were performed on 19 <u>additional</u> GEICO Insureds at Doctor Max, Fernandez Medical, Global Care, Health and Wellness, Pain Relief Clinic, and Palmetto Health; and (b) at least 180 <u>additional</u> physical therapy services purportedly provided to at least 27 <u>additional</u> GEICO Insureds at Doctor Max, Fernandez Medical, Global Care, Health and Wellness, Pain Relief Clinic, and Palmetto Health, including at least 21.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 33.5 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on May 24, 2018.

(xx)   On May 30, 2018, Pain Relief Clinic, Collazo, and Gomez-Cortes purported to provide at least 24 individual physical therapy services to at least 3 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 15-minute patient examination, and 33 five-minute examinations that were performed on 30 <u>additional</u> GEICO Insureds at Doctor Max, Fernandez Medical, Global Care, Palmetto Health, Restorative Therapy, and Wellness Healthcare; and (b) at least 252 <u>additional</u> physical therapy services purportedly provided to at least 35 <u>additional</u> GEICO Insureds at Doctor Max, Global Care, Fernandez Medical, Health and Wellness, Palmetto Health, Restorative Therapy, and Wellness Healthcare, including at least 38.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 45.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on May 30, 2018.

(xxi)   On June 6, 2018, Health and Wellness, Perez, Franco, and Gomez-Cortes purported to provide at least 47 individual physical therapy services to at least 8 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 45-minute new patient examination, one 30-minute new patient examination, 28 five-minute examinations that were performed on 29 <u>additional</u> GEICO Insureds at A & J Rehab, Doctor Max, Global Care, Pain Relief Clinic, Palmetto Health, Restorative Therapy, and Wellness Healthcare; and (b) at least 181 <u>additional</u> physical therapy services purportedly provided to at least 29 <u>additional</u> GEICO Insureds at A & J Rehab, Doctor Max, Global Care, Pain Relief Clinic, Palmetto Health, Restorative Therapy, and Wellness Healthcare,

including at least 29.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 40.5 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on June 6, 2018.

(xxii) On June 22, 2018, Fernandez Medical, M. Fernandez, and Gomez-Cortes purported to provide at least 24 individual physical therapy services to at least 4 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) three 30-minute new patient examination, and 18 five-minute examinations that were performed on 18 additional GEICO Insureds at Doctor Max, Global Care, Pain Relief, Palmetto Health, Restorative Therapy, and Wellness Healthcare; and (b) at least 90 additional physical therapy services purportedly provided to at least 23 additional GEICO Insureds at Doctor Max, Global Care, Pain Relief, Palmetto Health, Restorative Therapy, and Wellness Healthcare, including at least 22.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on June 22, 2018.

(xxiii) On August 3, 2018, Palmetto Health, Aleman, and Gomez-Cortes purported to provide at least 37 individual physical therapy services to at least 6 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) 14 five-minute examinations that were performed on 15 additional GEICO Insureds at Doctor Max, Global Care, Pain Relief Clinic, and Restorative Therapy; and (b) at least 148 additional physical therapy services purportedly provided to at least 22 additional GEICO Insureds at A & J Rehab Center, Atlantic Medical, Doctor Max, Global Care, Health and Wellness, Pain Relief Clinic, and Restorative Therapy, including at least 24.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on August 3, 2018.

(xxiv) On August 22, 2018, Fernandez Medical, M. Fernandez, and Gomez-Cortes purported to provide at least 36 individual physical therapy services to at least 3 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination, two 25-minute examinations, three 15-minute examinations, and 27 five-minute examinations that were performed on 30 additional GEICO Insureds at Doctor Max, Global Care, Health and Wellness Pain Relief, Palmetto Health, and Restorative Therapy; and (b) at least 108 additional physical therapy services purportedly provided to at least 28 additional GEICO Insureds at Doctor Max, Global Care, Health and Wellness Pain Relief, Palmetto Health, and Restorative Therapy, including at least 27 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 39 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on August 22, 2018.

(xxv) On September 17, 2018, Fernandez Medical, M. Fernandez, Gomez-Cortes, and Martinez purported to provide at least 20 individual physical therapy services to at least 4 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) 33 five-minute examinations that were performed on 31 additional GEICO Insureds at Doctor Max, Pain Relief, Palmetto Health, and Restorative Therapy; and (b) at least 115 additional physical therapy services purportedly provided to at least 33 additional GEICO Insureds at Doctor Max, Health and Wellness, Pain Relief, Palmetto Health, and Restorative Therapy, including at least 28.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 36.5 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on September 17, 2018.

(xxvi) On October 10, 2018, Wellness Healthcare, T. Hernandez, N. Fernandez, and Gomez-Cortes purported to provide at least 13 individual physical therapy services to at least 2 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.75 hours of physical therapy services that required direct, one-

on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) 25 five-minute examinations that were performed on 24 <u>additional</u> GEICO Insureds at Doctor Max, Pain Relief Clinic, and Restorative Therapy; and (b) at least 189 <u>additional</u> physical therapy services purportedly provided to at least 29 <u>additional</u> GEICO Insureds at Doctor Max, Fernandez Medical, Global Care, Health and Wellness, Pain Relief Clinic, and Restorative Therapy, including at least 30 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 33.75 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on October 10, 2018.

(xxvii) On December 6, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes purported to provide at least 6 individual physical therapy services to at least 1 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least .75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) three 25-minute patient examinations, one 15-minute examination, and 27 five-minute examinations that were performed on 30 <u>additional</u> GEICO Insureds at Health and Wellness, Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare; and (b) at least 174 <u>additional</u> physical therapy services purportedly provided to at least 28 <u>additional</u> GEICO Insureds at A & J Rehab Center, Health and Wellness, Pain Relief Clinic, Palmetto Health, Restorative Therapy, and Wellness Healthcare, including at least 23.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 28.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on December 6, 2018.

(xxviii) On January 2, 2019, Restorative Therapy, Castellanos, Franco, and Gomez-Cortes purported to provide at least 42 individual physical therapy services to at least 7 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) 22 five-minute examinations that were performed on 21 <u>additional</u> GEICO Insureds at Pain Relief, Palmetto Health, and Wellness Healthcare; and (b) at least 179 <u>additional</u> physical therapy services purportedly provided to at least 33 <u>additional</u> GEICO Insureds at A& J Rehab Center, Pain Relief, Palmetto Health, and Wellness Healthcare, including at least 20.25 hours of physical

therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on January 2, 2019.

(xxix)   On February 22, 2019, Palmetto Health, Aleman, and Gomez-Cortes purported to provide at least 58 individual physical therapy services to at least 9 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) two 45-minute new patient examinations, one 25-minute patient examination, and 17 five-minute examinations that were performed on 18 additional GEICO Insureds at Pain Relief Clinic, and Wellness Healthcare; and (b) at least 195 additional physical therapy services purportedly provided to at least 32 additional GEICO Insureds at A & J Rehab Center, Atlantic Medical, Health and Wellness, National Health care Inc., Pain Relief Clinic, Restorative Therapy, and Wellness Healthcare, including at least 28.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 39.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on February 22, 2019.

(xxx)   On March 5, 2019, Wellness Healthcare, T. Hernandez, N. Fernandez, and Gomez-Cortes purported to provide at least 12 individual physical therapy services to at least 2 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination, 18 five-minute examinations that were performed on 19 additional GEICO Insureds at National Health care, Pain Relief Clinic, and Palmetto Health; and (b) at least 249 additional physical therapy services purportedly provided to at least 40 additional GEICO Insureds at Atlantic Medical, A & J Rehab Center, National Health care Inc., Pain Relief Clinic, Palmetto Health, Restorative Therapy, and Star Medical Center,  including at least 36.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 39.75 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on March 5, 2019.

(xxxi) On April 23, 2019, Palmetto Health, Aleman, and Gomez-Cortes purported to provide at least 38 individual physical therapy services to at least 6 individual Insureds, and falsely contended in the resulting bills to GEICO that Gomez-Cortes personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Gomez-Cortes also purported to personally perform, or at least directly supervise: (a) one 15-minute patient examinations, and 19 five-minute examinations that were performed on 20 additional GEICO Insureds at Pain Relief Clinic, Star Medical Center, and Wellness Healthcare; and (b) at least 207 additional physical therapy services purportedly provided to at least 34 additional GEICO Insureds at A & J Rehab Center, Fernandez Medical, National Health care Inc., Pain Relief Clinic, Restorative Therapy, Star Medical Center, and Wellness Healthcare, including at least 31.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 38.25 hours of services that Gomez-Cortes purported to personally perform, or at least directly supervise, on April 23, 2019.

91.     These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" – "8", the Clinic Owner Defendants, Clinic Defendants, and the Clinic Medical Director Defendants routinely falsely represented that Gomez-Cortes had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants and other health care clinics.

92.     It is improbable, to the point of impossibility, that Gomez-Cortes – who was relatively advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed or directly supervised such a high volume of physical therapy services on individual dates.

93.     Upon information and belief, the fraudulent billing for physical therapy services that the Clinic Owner Defendants, Clinic Defendants, and the Clinic Medical Director

Defendants submitted or caused to be submitted through the Clinic Defendants, respectively, to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that the Clinic Owner Defendants, Clinic Defendants, and the Clinic Medical Director Defendants submitted through the respective Clinic Defendants to all of the automobile insurers in the Florida automobile insurance market.

94.     GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

95.     It is extremely improbable, to the point of impossibility, that the Clinic Owner Defendants, Clinic Defendants, and the Clinic Medical Director Defendants only submitted fraudulent billing to GEICO, and that the Clinic Owner Defendants, Clinic Defendants, and the Clinic Medical Director Defendants did not simultaneously bill other automobile insurers.

96.     Thus, upon information and belief, the impossible number of physical therapy services that Gomez-Cortes purported to directly supervise or provide to GEICO Insureds at the Clinic Defendants on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services that Gomez-Cortes purported to directly supervise or provide at the Clinic Defendants, including to individuals insured by companies other than GEICO, on those same dates of service.

97.     In fact, Gomez-Cortes did not perform or directly supervise any of the physical therapy services that were billed through the Clinic Defendants to GEICO.

98.     What is more, since at least January 1, 2013, the Clinic Defendants did not actually provide any legitimate physical therapy services to GEICO Insureds.

99.     Rather: (i) all of the putative "physical therapy" services that Gomez-Cortes purported to provide through the Clinic Defendants to Insureds since January 1, 2013 were

performed, to the extent that they were performed at all, by the Massage Therapist Defendants and other massage therapists or unlicensed individuals associated with the Clinic Defendants, rather than by Gomez-Cortes; (ii) Gomez-Cortes did not even legitimately supervise the putative "physical therapy" services that were billed through the Clinic Defendants to GEICO since January 1, 2013; and (iii) none of the putative "physical therapy" services that were billed through the Clinic Defendants to GEICO since January 1, 2013 actually constituted physical therapy, because the Massage Therapist Defendants and other massage therapists or unlicensed individuals associated with the Clinic Defendants are not and never have been licensed as physical therapists, and did not perform the pertinent services under the supervision of any licensed physical therapist, physician, or other health care provider.

100.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

101.    All of the billing that the Clinic Owner Defendants, Clinic Defendants, and the Clinic Medical Director Defendants submitted through the Clinic Defendants to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

102.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

103.    To "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

104.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

105.    The Clinic Defendants were well-aware of the fact that – because the Massage Therapist Defendants and other massage therapists or unlicensed individuals associated with the Clinic Defendants were unsupervised massage therapists, rather than physical therapists – the Clinic Defendants could not recover PIP Benefits for any services that the Massage Therapist Defendants and other massage therapists or unlicensed individuals associated with the Clinic Defendants purported to provide with respect to insurance policies issued after January 1, 2013.

106.    As a result, and in order to conceal the fact that the Massage Therapist Defendants and other massage therapists or unlicensed individuals associated with the Clinic Defendants unlawfully provided, without any legitimate supervision by Gomez-Cortes, all of the "physical therapy" services that were billed through the Clinic Defendants to GEICO with respect to insurance policies issued after January 1, 2013, the Clinic Defendants deliberately omitted any reference to the Massage Therapist Defendants and other massage therapists or unlicensed

individuals on many of the HCFA-1500 forms that they used to bill for the putative physical therapy services.

107.    Instead, in the claims for physical therapy services identified in Exhibits "1" – "8", the Clinic Owner Defendants, Clinic Defendants, Clinic Medical Director Defendants, and the Massage Therapist Defendants routinely falsely listed Gomez-Cortes on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

108.    For example:

(i)     On or about April 20, 2015, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Pain Relief Clinic to an Insured named CR between March 25, 2015 and April 2, 2015. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Pain Relief Clinic, Collazo, and Gomez-Cortes deliberately omitted any reference to any massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(ii)    On or about October 1, 2015, Health and Wellness, Perez, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Health and Wellness to an Insured named RE between September 10, 2015 and September 16, 2015. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Health and Wellness Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(iii)   On or about March 25, 2016, Health and Wellness, Perez, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Health and Wellness to an Insured named AP between March 8, 2016 and March 15, 2016. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Health and Wellness Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed

individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(iv)     On or about July 8, 2016, Health and Wellness, Perez, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Health and Wellness to an Insured named EC between June 16, 2016 and June 23, 2016. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Health and Wellness Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(v)      On or about August 4, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Restorative Therapy to an Insured named NH between July 26, 2016 and August 2, 2016. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Y. Hernandez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Y. Hernandez, without any legitimate supervision by Gomez-Cortes.

(vi)     On or about August 5, 2016, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Pain Relief Clinic to an Insured named IA between July 20, 2016 and August 1, 2016. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Pain Relief Clinic, Collazo, and Gomez-Cortes deliberately omitted any reference to any massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(vii)    On or about September 3, 2016, Wellness Healthcare, J. Cabrera, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Wellness Healthcare to an Insured named AG between August 15, 2016 and September 1, 2016. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Wellness Healthcare Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or

40

unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(viii) On or about October 26, 2016, Wellness Healthcare, J. Cabrera, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Wellness Healthcare to an Insured named AA between October 4, 2016 and October 25, 2016. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Wellness Healthcare Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(ix) On or about December 2, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Restorative Therapy to an Insured named IV between November 15, 2016 and November 23, 2016. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Gallo, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Gallo, without any legitimate supervision by Gomez-Cortes.

(x) On or about December 5, 2016, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Pain Relief Clinic to an Insured named MP between November 16, 2016 and November 26, 2016. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Pain Relief Clinic, Collazo, and Gomez-Cortes deliberately omitted any reference to any massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xi) On or about January 18, 2017, Health and Wellness, Perez, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Health and Wellness to an Insured named DI between January 11, 2017 and January 17, 2017. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Health and Wellness Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the

underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xii)   On or about March 18, 2017, Global Care, De Feria, Dreke, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Global Care to an Insured named HM between February 24, 2017 and March 10, 2017. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by M. Lopez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by M. Lopez, without any legitimate supervision by Gomez-Cortes.

(xiii)  On or about May 10, 2017, Wellness Healthcare, J. Cabrera, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Wellness Healthcare to an Insured named AA between April 24, 2017 and May 8, 2017. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Wellness Healthcare Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xiv)   On or about October 27, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Global Care to an Insured named NL between October 3, 2017 and October 18, 2017. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by M. Lopez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by M. Lopez, without any legitimate supervision by Gomez-Cortes.

(xv)    On or about November 7, 2017, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Wellness Healthcare to an Insured named RV between October 24, 2017 and November 6, 2017. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Wellness Healthcare Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were

performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xvi)  On or about March 28, 2018, Fernandez Medical, M. Fernandez, Gomez-Cortes, billed GEICO for physical therapy services that purportedly were provided through Fernandez Medical to an Insured named RM between February 9, 2018 and March 26, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Martinez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Martinez, without any legitimate supervision by Gomez-Cortes.

(xvii)  On or about June 6, 2018, Health and Wellness, Perez, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Health and Wellness to an Insured named PH between May 16, 2018 and May 29, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Health and Wellness Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xviii)  On or about May 3, 2018, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Pain Relief Clinic to an Insured named IC between April 18, 2018 and April 27, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Pain Relief Clinic, Collazo, and Gomez-Cortes deliberately omitted any reference to any massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist or unlicensed individual, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xix)  On or about May 25, 2018, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Pain Relief Clinic to an Insured named AG between May 9, 2018 and May 17, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Pain Relief Clinic, Collazo, and Gomez-Cortes deliberately omitted any reference to any massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist, in keeping with the fact that the pertinent services were performed – to the extent that they

were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xx)    On or about June 29, 2018, Fernandez Medical, M. Fernandez, Gomez-Cortes, billed GEICO for physical therapy services that purportedly were provided through Fernandez Medical to an Insured named JC between June 12, 2018 and June 27, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Martinez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Martinez, without any legitimate supervision by Gomez-Cortes.

(xxi)   On or about July 11, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Doctor Max to an Insured named LD between June 15, 2018 and July 9, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Herrera, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Herrera, without any legitimate supervision by Gomez-Cortes.

(xxii)  On or about July 24, 2018, 2018, Fernandez Medical, M. Fernandez, Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Fernandez Medical to an Insured named GR between July 2, 2018 and July 20, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Martinez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Martinez, without any legitimate supervision by Gomez-Cortes.

(xxiii) On or about August 3, 2018, Restorative Therapy, Castellanos, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Restorative Therapy to an Insured named RH between July 17, 2018 and July 31, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Gallo, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Gallo, without any legitimate supervision by Gomez-Cortes.

(xxiv)  On or about September 11, 2018, Fernandez Medical, M. Fernandez, Gomez-Cortes, billed GEICO for physical therapy services that purportedly were provided through Fernandez Medical to an Insured named JA between August 14,

2018 and August 24, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Martinez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Martinez, without any legitimate supervision by Gomez-Cortes.

(xxv)   On or about September 20, 2018, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Palmetto Health to an Insured EG between August 23, 2018 and September 13, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Simon, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Simon, without any legitimate supervision by Gomez-Cortes.

(xxvi)  On or about September 20, 2018, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Palmetto Health to an Insured ER between August 23, 2018 and September 14, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Simon, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Simon, without any legitimate supervision by Gomez-Cortes.

(xxvii) On or about October 4, 2018, Doctor Max,  I. Cabrera, Leva, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Doctor Max to an Insured named LE between September 13, 2018 and September 28, 2018. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Herrera, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Herrera, without any legitimate supervision by Gomez-Cortes.

(xxviii) On or about January 28, 2019, Wellness Healthcare, T. Hernandez, N. Fernandez, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Wellness Healthcare to an Insured named WL between January 7, 2019 and January 29, 2019. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Wellness Healthcare Defendants deliberately omitted any reference to a massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist, in keeping with the fact that the pertinent services were

performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xxix)   On or about February 15, 2019, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Pain Relief Clinic to an Insured named AR between January 23, 2019 and February 2, 2019. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services, and the Pain Relief Clinic, Collazo, and Gomez-Cortes deliberately omitted any reference to any massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist or unlicensed individual, without any legitimate supervision by Gomez-Cortes.

(xxx)   On or about February 22, 2019, Restorative Therapy, Castellanos, Franco, and Gomez-Cortes billed GEICO for physical therapy services that purportedly were provided through Restorative Therapy to an Insured named RA between February 5, 2019 and February 15, 2019. The HCFA-1500 form falsely represented that Gomez-Cortes performed, or at least directly supervised, the pertinent physical therapy services. However, the underlying physical therapy treatment notes were signed by Gallo, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Gallo, without any legitimate supervision by Gomez-Cortes.

109.   These are only representative examples. In a substantial majority of the claims for physical therapy services that are identified in Exhibits "1" – "8", the Clinic Owner Defendants, Clinic Defendants, and the Clinic Medical Director Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Gomez-Cortes had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by the Massage Therapist Defendants and other massage therapists or unlicensed individuals associated with the Clinic Defendants, to the extent that they were performed at all, without any supervision by Gomez-Cortes or anyone else.

110.   In the claims for physical therapy services identified in Exhibits "1" – "8", the Clinic Defendants routinely fraudulently misrepresented that the physical therapy services were

lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the putative physical therapy services were illegally performed – to the extent they were performed at all – by unsupervised massage therapists, without any supervision by anyone, in contravention of Florida law;

(ii) the Clinic Defendants could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by unsupervised massage therapists; and

(iii) the Clinic Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed or directly supervised the putative physical therapy services in their billing for the putative "physical therapy" services.

111.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that the Clinic Defendants operated without legitimate medical directors.

112.    For instance, the Clinic Medical Director Defendants did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

113.    Nor, for that matter, did the Clinic Medical Director Defendants "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

114.    Had the Clinic Medical Director Defendants actually fulfilled their statutory roles as medical directors at the Clinic Defendants, they would have noted – among other things – that the Clinic Defendants routinely fraudulently represented in the Clinic Defendants' billing that the physical therapy services were performed, or at least directly supervised, by Gomez-Cortes.

115.    Had the Clinic Medical Director Defendants actually fulfilled their statutory roles as medical directors at the Clinic Defendants, they would have noted – among other things – that the Clinic Defendants routinely fraudulently concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – by the Massage Therapist Defendants and other massage therapists or unlicensed individuals without any supervision by anyone, and therefore were non-reimbursable under the No-Fault Law.

116.    Had the Clinic Medical Director Defendants actually fulfilled their statutory roles as medical directors at the Clinic Defendants, they would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services without supervision.

117.    The Clinic Medical Director Defendants did none of these things, because they never actually served as legitimate medical directors at the Clinic Defendants in the first instance, rendering the Clinic Defendants ineligible to collect PIP Benefits in the first instance.

C.    **The Defendants' Fraudulent Treatment and Billing Protocols**

118.     In the claims identified in Exhibits "1" – "8", virtually all of the Insureds whom the Defendants purported to treat at the Clinic Defendants were involved in minor, low-speed, low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

119.    Concomitantly, in the claims identified in Exhibits "1" – "8", almost none of the Insureds whom the Defendants purported to treat at the Clinic Defendants suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

120.     Even so, in the claims identified in Exhibits "1" – "8", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

121.     The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" – "8" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

122.     Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

123.     No legitimate physician, physical therapist, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

124.     The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because: (i) the Clinic Defendants were, at all relevant times, operating in violation of the Clinic Act, without legitimate medical directors who legitimately fulfilled their statutory duties as medical directors; (ii) all decision-making with respect to medical care and billing at the Clinic Defendants was, at all relevant times, vested entirely with non-physicians – specifically the Clinic Owner Defendants; (iii) a substantial majority of the putative "physical therapy" services that purportedly were provided to Insureds

49

through the Clinic Defendants were provided – to the extent that they were provided at all – by the Massage Therapist Defendants and other massage therapists or unlicensed individuals without legitimate oversight and supervision, rather than by or under the supervision of licensed physical therapists or physicians, in further violation of Florida law; and (iv) the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.      The Fraudulent Charges for Initial Examinations**

125.    As a first step in their fraudulent treatment and billing protocol, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health purported to provide virtually every Insured in the claims identified in Exhibits "2" – "8" with an initial examination.

126.    Gomez-Cortes purported to personally perform a substantial majority of the initial examinations in the claims identified in Exhibits "2" – "8".

127.    As set forth in Exhibit "2", Pain Relief Clinic, Collazo, and Gomez-Cortes then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, resulting in charges of $240.00 for each initial examination that they purported to provide.

128.    As set forth in Exhibit "3", Health and Wellness, Perez, Gomez-Cortes, and Franco then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, resulting in charges of $240.00 for each initial examination that they purported to provide.

129.    As set forth in Exhibit "4", Wellness Healthcare, J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez then billed the initial examinations to GEICO, or caused them

to be billed to GEICO, under CPT codes 99204 and 99203, resulting in charges of $265.00 or $300.00 for each initial examination that they purported to provide.

130.    As set forth in Exhibit "5", Restorative Therapy, Castellanos, R. Diaz, Franco, and Gomez-Cortes then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, resulting in charges between $335.00 and $360.00 for each initial examination that they purported to provide.

131.    As set forth in Exhibit "6", Global Care, Dreke, De Feria, and Gomez-Cortes then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, resulting in charges between $335.00 and $360.00 for each initial examination that they purported to provide.

132.    As set forth in Exhibit "7", Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, resulting in charges of $300.00 for each initial examination that they purported to provide.

133.    As set forth in Exhibit "8", Palmetto Health, Aleman, and Gomez-Cortes then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, resulting in charges of $300.00 for each initial examination that they purported to provide.

134.    In the claims for initial examinations identified in Exhibits "2" – "8", the charges for the initial examinations were fraudulent in that they misrepresented Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health's eligibility to collect PIP Benefits in the first instance.

135.     As set forth below, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health never were eligible to collect PIP Benefits, inasmuch as they were operated in violation of the licensing and operating requirements set forth in the Clinic Act.

136.     Moreover, and as set forth below, the charges for the initial examinations identified in Exhibits "2" – "8" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

137.     As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

138.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

139.     Pursuant to the CPT Assistant, the use of CPT codes 99203 or 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity (if billed under CPT code 99203) or moderate to high severity (if billed under CPT code 99204).

140.     For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)          Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)        Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)       Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)       Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)        Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)       Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)      Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

141.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

142.    Along similar lines, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)        Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)        Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)       Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)       Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)      Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

143.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

144.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "2" – "8" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

145.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "2" – "8" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low or minimal severity, in the vast majority of the claims identified in Exhibits "2" – "8" the Insureds did not seek treatment at any hospital as the result of their accidents.

146.    To the limited extent that the Insureds in the claims identified in Exhibits "2" – "8" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis.

147.    Furthermore, in the substantial majority of the claims identified in Exhibits "2" – "8", the contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

148.     Even so, in the claims for initial examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely billed for their putative initial examinations using CPT codes 99204 and 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

149.     For example:

(i)      On July 27, 2015, an Insured named BR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BR's vehicle was drivable following the accident. The police report further indicated that BR was not injured and did not complain of any pain at the scene. In keeping with the fact that BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of BR on August 4, 2015, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)     On September 25, 2015, an Insured named DR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DR's vehicle was drivable following the accident. The police report further indicated that DR was not injured and did not complain of any pain at the scene. In keeping with the fact that DR was not seriously injured, DR did not visit any hospital emergency room following the accident. To the extent that DR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DR on September 30, 2015, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)    On January 20, 2016, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured and did not complain of any pain at the scene. In keeping with the fact that JA was not seriously injured, JA did not visit any hospital emergency room following the accident. To

the extent that JA experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JA on January 27, 2016, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)     On June 6, 2016, an Insured named RF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that RF's vehicle was drivable following the accident. The police report further indicated that RF was not injured and did not complain of any pain at the scene. In keeping with the fact that RF was not seriously injured, RF did not visit any hospital emergency room following the accident. To the extent that RF experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RF on June 14, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)      On August 9, 2016, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JC on August 11, 2016, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)     On August 18, 2016, an Insured named RV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RV's vehicle was drivable following the accident. The police report further indicated that RV was not injured and did not complain of any pain at the scene. In keeping with the fact that RV was not seriously injured, RV did not visit any hospital emergency room following the accident. To the extent that RV experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RV on August 24, 2016, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)     On November 15, 2016, an Insured named IV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that IV's vehicle was drivable following the accident. The police report further indicated that IV was not injured and did not complain of any pain at the scene. In keeping with the fact that IV was not seriously injured, IV did not visit any hospital emergency room following the accident. To the extent that IV experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of IV on November 17, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)    On December 21, 2016, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AS on January 3, 2017, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)      On April 18, 2017, an Insured named LL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LL's vehicle was drivable following the accident. The police report further indicated that LL was not injured and did not complain of any pain at the scene. In keeping with the fact that LL was not seriously injured, LL did not visit any hospital emergency room following the accident. To the extent that LL experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LL on April 19, 2017, Wellness Healthcare, J. Cabrera, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x)       On May 14, 2017, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured and did not complain of any pain at the scene. In keeping with the fact that JA was not seriously injured, JA did not visit any hospital emergency room following the accident. To the extent that JA experienced any health problems at all as the result of the accident, they were of

low or minimal severity. Even so, following a purported initial examination of JA on May 17, 2017, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xi)     On May 28, 2017, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JG on June 8, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xii)    On June 6, 2017, an Insured named YP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YP's vehicle was drivable following the accident. The police report further indicated that YP was not injured and did not complain of any pain at the scene. In keeping with the fact that YP was not seriously injured, YP did not visit any hospital emergency room following the accident. To the extent that YP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YP on June 14, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiii)   On June 14, 2017, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GC was not injured and did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To the extent that GC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of GC on June 15, 2017, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)    On August 22, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured and did not complain

of any pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of EL on August 28, 2017, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xv)   On September 15, 2017, an Insured named DG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DG's vehicle was drivable following the accident. The police report further indicated that DG was not injured and did not complain of any pain at the scene. In keeping with the fact that DG was not seriously injured, DG did not visit any hospital emergency room following the accident. To the extent that DG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DG on September 18, 2017, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xvi)  On September 28, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AS on September 29, 2017, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xvii) On December 6, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AS on December 7, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO for the initial examination using CPT

code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xviii)  On December 20, 2017, an Insured named FT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FT's vehicle was drivable following the accident. The police report further indicated that FT was not injured and did not complain of any pain at the scene. In keeping with the fact that FT was not seriously injured, FT did not visit any hospital emergency room following the accident. To the extent that FT experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of FT on December 26, 2017, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xix)  On January 13, 2018, an Insured named OR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that OR's vehicle was drivable following the accident. The police report further indicated that OR was not injured and did not complain of any pain at the scene. In keeping with the fact that OR was not seriously injured, OR did not visit any hospital emergency room following the accident. To the extent that OR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of OR on January 23, 2018, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xx)  On May 21, 2018, an Insured named FG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FG's vehicle was drivable following the accident. The police report further indicated that FG was not injured and did not complain of any pain at the scene. In keeping with the fact that FG was not seriously injured, FG did not visit any hospital emergency room following the accident. To the extent that FG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of FG on May 22, 2018, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxi)  On May 21, 2018, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH

was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of SH on May 22, 2018, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxii)   On May 25, 2018, an Insured named CP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CP's vehicle was drivable following the accident. The police report further indicated that CP was not injured and did not complain of any pain at the scene. In keeping with the fact that CP was not seriously injured, CP did not visit any hospital emergency room following the accident. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CP on May 29, 2018, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxiii)  On June 13, 2018, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LP on June 15, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxiv)   On July 24, 2018, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LP on July 25, 2018, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxv)    On July 29, 2018, an Insured named CP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that CP's vehicle was drivable following the accident. The police report further indicated that CP was not injured and did not complain of any pain at the scene. In keeping with the fact that CP was not seriously injured, CP did not visit any hospital emergency room following the accident. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CP on July 31, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxvi)   On October 9, 2018, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LG's vehicle was drivable following the accident. The police report further indicated that LG was not injured and did not complain of any pain at the scene. In keeping with the fact that LG was not seriously injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LG on October 10, 2018, Wellness Healthcare, T. Hernandez, N. Fernandez, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxvii)  On February 15, 2019, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured and did not complain of any pain at the scene. In keeping with the fact that JM was not seriously injured, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JM on February 19, 2019, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxviii) On February 15, 2019, an Insured named YD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YD's vehicle was drivable following the accident. The police report further indicated that YD was not injured and did not complain of any pain at the scene. In keeping with the fact that YD was not seriously injured, YD did not visit any hospital emergency room following the

accident. To the extent that YD experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YD on February 19, 2019, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

150.     These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health falsely represented that the Insureds presented with problems of moderate or moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

151.     In the claims for initial examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

152.     In the claims for initial examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care,

Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

153.    What is more, in every claim identified in Exhibits "2" – "8" for initial examinations under CPT codes 99204 and 99203, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health misrepresented and exaggerated the amount of face-to-face time that the examining physician – purportedly Gomez-Cortes – spent with the Insureds or the Insureds' families during the putative initial examination.

154.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

155.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination represents that the physician who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

156.    As set forth in Exhibits "2" – "3" and "6" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health submitted many of their bills for initial examinations under CPT code 99203, and thereby represented that the physician who purported to perform the initial examinations spent 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

157.    Moreover, as set forth in Exhibits "4" – "5", Wellness Healthcare, J. Cabrera, T. Hernandez, Gomez-Cortes, N. Fernandez, Restorative Therapy, R. Diaz, and Castellanos submitted many of their bills for initial examinations under CPT code 99204, and thereby represented that the physician who purported to perform the initial examinations spent 45 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

158.    In fact, in the initial examinations identified in Exhibits "2" – "8", Gomez-Cortes virtually never spent even 10 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 30 or 45 minutes, to the extent that the examinations actually were conducted at all.

159.    Rather, in the purported initial examinations identified in Exhibits "2" – "8", the examinations rarely entailed more than 10 minutes of face-to-face time between Gomez-Cortes, the Insureds, and the Insureds' families, to the extent that they were provided at all.

160.    In keeping with the fact that the initial examinations in the claims identified in Exhibits "2" – "8" did not involve more than 10 minutes of face-to-face time between Gomez-Cortes, the Insureds, or the Insureds' families – to the extent that they were provided at all – Gomez-Cortes used pre-printed checklist forms in purporting to conduct the examinations.

161.     All that was required to complete the pre-printed checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

162.     These interviews and examinations did not require Gomez-Cortes to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

163.     Indeed, Gomez-Cortes could not legitimately have personally spent at least 30 minutes of face-to-face time with the Insureds or their families during the initial examinations at Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health, considering the massive amount of health care services he simultaneously was purporting to personally perform or directly supervise at numerous health care clinics and medical practices throughout the Miami area on the same dates of service as the purported examinations.

164.     For example:

(i)      On August 5, 2014, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named RF and MP and falsely represented that Gomez-Cortez spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortez also purported to personally provide or directly supervise more than 17 hours of physical therapy services to 17 individual Insureds, from 4 different facilities, all of which were billed to GEICO.

(ii)     On September 17, 2014, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for four initial examinations of three individual Insureds named KM, OC, AP, and DG, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of two hours. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 22 hours of physical therapy services to 19 individual Insureds from 5 different facilities, all of which were billed to GEICO.

(iii)    On December 3, 2014, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for three initial examinations of three individual

Insureds named JP, IS, and DH, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one-and-a-half hours. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 21 hours of physical therapy services to 20 individual Insureds, one initial examination to one Individual Insured totaling 45 minutes, and three follow-up examinations to three individual Insureds, from 5 different facilities, all of which were billed to GEICO.

(iv)     On September 30, 2015, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named DR, AM, and MA, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one-and-a-half hours. On that same date, Gomez-Cortes also purported to personally provide or directly supervise 17 hours of physical therapy services to 14 individual Insureds and ten follow-up examinations to ten individual Insureds, from 3 different facilities, all of which were billed to GEICO.

(v)      On August 15, 2016, Wellness Healthcare, J. Cabrera, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of three individual Insureds named DG, EG, and AG and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 21 hours of physical therapy services to 23 individual Insureds and 16 follow-up examinations to 16 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

(vi)     On November 2, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named GP and IP, and falsely represented that Gomez-Cortes spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination, for a total of 90 minutes. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 21 hours of physical therapy services to 21 individual Insureds and 19 examinations to 19 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

(vii)    On November 3, 2016, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named DI and MP, and falsely represented that Gomez-Cortez spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortez also purported to personally provide or directly supervise more than 30 hours of physical therapy services to 29 individual Insureds and 33 examinations

to 33 individual Insureds, from 7 different facilities, all of which were billed to GEICO.

(viii)   On March 28, 2017, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named DF and JF, and falsely represented that Gomez-Cortez spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortez also purported to personally provide or directly supervise more than 19 hours of physical therapy services to 20 individual Insureds and 25 examinations to 25 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

(ix)   On May 23, 2017, Global Care, Dreke, De-Feria, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named LM and AV, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 25 hours of physical therapy services to 26 individual Insureds and 24 examinations to 24 individual Insureds, from 7 different facilities, all of which were billed to GEICO.

(x)   On June 1, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named JO and JO, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 23 hours of physical therapy services to 25 individual Insureds and 24 examinations to 24 individual Insureds, from 7 different facilities, all of which were billed to GEICO.

(xi)   On July 5, 2017, Wellness Healthcare, J. Cabrera, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named RR andf PG, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 25 hours of physical therapy services to 28 individual Insureds and 29 follow-up examinations to 29 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

(xii)   On September 25, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named AL and VT, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also

purported to personally provide or directly supervise more than 34 hours of physical therapy services to 35 individual Insureds and 28 examinations to 28 individual Insureds, from 8 different facilities, all of which were billed to GEICO.

(xiii)   On September 29, 2017, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named MD and AS, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 29 hours of physical therapy services to 30 individual Insureds and 26 follow-up examinations to 26 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

(xiv)   On October 3, 2017, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named KD and JC, and falsely represented that Gomez-Cortes spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination, for a total of 90 minutes. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 30 hours of physical therapy services to 34 individual Insureds and 30 examinations to 30 individual Insureds, all of which were billed to GEICO.

(xv)   On January 3, 2018, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named IC and HS, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 37 hours of physical therapy services to 30 individual Insureds and 17 follow-up examinations to 17 individual Insureds, from 7 different facilities, all of which were billed to GEICO.

(xvi)   On January 11, 2018, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named NB and AG, and falsely represented that Gomez-Cortez spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortez also purported to personally provide or directly supervise more than 43 hours of physical therapy services to 36 individual Insureds and 24 examinations to 24 individual Insureds, from 9 different facilities, all of which were billed to GEICO.

(xvii)   On February 21, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named IR and ZS and falsely represented that Gomez-Cortes

spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 39 hours of physical therapy services to 38 individual Insureds and 28 examinations to 28 individual Insureds, from seven different facilities, all of which were billed to GEICO.

(xviii)   On March 15, 2018, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named MC and CG, and falsely represented that Gomez-Cortes spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination, for a total of 90 minutes. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 26 hours of physical therapy services to 33 individual Insureds and 18 examinations to 18 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

(xix)   On April 3, 2018, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO under CPT code 99203 for two initial examinations of three individual Insureds named AG, WG, and AH, and falsely represented that Gomez-Cortez spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortez also purported to personally provide or directly supervise more than 31 hours of physical therapy services to 29 individual Insureds and 21 examinations to 21 individual Insureds, from 8 different facilities, all of which were billed to GEICO.

(xx)   On May 2, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named RN, YR, and IA, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 22 hours of physical therapy services to 27 individual Insureds and 20 examinations to 17 individual Insureds, from eight different facilities, all of which were billed to GEICO.

(xxi)   On May 7, 2018, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named NM and JP, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 31 hours of physical therapy services to 33 individual Insureds and 21 examinations to 21 individual Insureds, from 8 different facilities, all of which were billed to GEICO.

(xxii)   On May 22, 2018, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named LV and MV, and falsely represented that Gomez-Cortes spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination, for a total of 90 minutes. On that same date, Gomez-Cortes also purported to personally provide or directly supervise 39 hours of physical therapy services to 42 individual Insureds and 31 examinations to 31 individual Insureds, from 8 different facilities, all of which were billed to GEICO.

(xxiii)  On May 29, 2018, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named AG and CP, and falsely represented that Gomez-Cortes spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one-and-a-half hours. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 42 hours of physical therapy services to 45 individual Insureds and 41 follow-up examinations to 41 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

(xxiv)   On July 31, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named LD, MM, and CP, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one-and-a-half hours. On that same date, Gomez-Cortes also purported to personally provide or directly supervise 39 hours of physical therapy services to 40 individual Insureds and 29 examinations to 29 individual Insureds, from 10 different facilities, all of which were billed to GEICO.

(xxv)    On September 21, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named MR and AZ, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 33 hours of physical therapy services to 35 individual Insureds and 28 examinations to 28 individual Insureds, from eight different facilities, all of which were billed to GEICO.

(xxvi)   On August 29, 2018, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named YR and OC, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 31 hours of physical therapy services to 36 individual Insureds and 28 examinations to 28

individual Insureds, from nine different facilities, all of which were billed to GEICO, all of which were billed to GEICO.

(xxvii) On October 10, 2018, Wellness Healthcare, T. Hernandez, N. Fernandez, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named LG and JS, and falsely represented that Gomez-Cortes spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one-and-a-half hours. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 31 hours of physical therapy services to 32 individual Insureds and 26 follow-up examinations to 26 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

(xxviii) On December 13, 2018, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named LG, VP, and YH, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one-and-a-half hours. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 25 hours of physical therapy services to 30 individual Insureds and 26 examinations to 26 individual Insureds, from seven different facilities, all of which were billed to GEICO.

(xxix) On February 20, 2019, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named JG and ML, and falsely represented that Gomez-Cortes spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 34 hours of physical therapy services to 37 individual Insureds and 20 follow-up examinations to 19 individual Insureds, from 8 different facilities, all of which were billed to GEICO.

(xxx) On April 30, 2019, Restorative Therapy, Castellanos, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named FC and MG, and falsely represented that Gomez-Cortes spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination, for a total of 90 minutes. On that same date, Gomez-Cortes also purported to personally provide or directly supervise more than 33 hours of physical therapy services to 40 individual Insureds and 24 examinations to 24 individual Insureds, from 6 different facilities, all of which were billed to GEICO.

165.     These are only representative examples. In the claims for initial examinations that are identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and

Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely falsely represented that Gomez-Cortes had spent between 30 and 45 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Gomez-Cortes also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout the Miami area.

166.    Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

**c.    Misrepresentations Regarding "Comprehensive" or "Detailed" Physical Examinations**

167.    Moreover, in the claims identified in Exhibits "2" – "8" for initial examinations under CPT codes 99203 or 99204, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health falsely represented the extent of the underlying physical examinations.

168.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

169.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

170.    As set forth in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health virtually always billed for their putative initial examinations using either CPT code 99203 or 99204, and thereby represented that Gomez-Cortes conducted detailed or comprehensive physical examinations of the Insureds who purportedly received the examinations.

171.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

172.    To the extent that the Insureds in the claims identified in Exhibits "2" – "8" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

173.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

174.    In the claims for initial examinations identified in Exhibits "2" – "3" and "6" – "8", when Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health billed for the initial examinations under CPT code 99203, they falsely represented Gomez-Cortes performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

175.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "2" – "3" and "6" – "8", neither Gomez-Cortes nor any other physician associated with Pain Relief Clinic, Health and Wellness, Global Care, Doctor Max, and Palmetto Health ever conducted an extended examination of the Insureds' musculoskeletal systems.

176.    For instance, in each of the claims under CPT code 99203 identified in Exhibits "2" – "3" and "6" – "8", neither Gomez-Cortes nor any other physician associated with Pain

Relief Clinic, Health and Wellness, Global Care, Doctor Max, and Palmetto Health ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)     examination of sensation.

177.   For example:

(i)      On September 10, 2014, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named NB, EB, and JN that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to NB, EB, and JN. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of NB, EB, and JN despite the fact that – to the extent NB, EB, and JN had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(ii)     On June 13, 2016, Health and Wellness, Perez, Franco, and Gomez-Cortes billed

GEICO under CPT code 99203 for two initial examinations of two individual Insureds named LC and IS that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to LC and IS. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of LC and IS despite the fact that – to the extent LC and IS had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(iii)   On December 22, 2016, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named IH and SP that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to IH and SP. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of IH and SP despite the fact that – to the extent IH and SP had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(iv)   On January 24, 2017, Health and Wellness, Perez, Franco, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named OG and RM that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to OG and RM. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of OG and RM despite the fact that – to the extent OG and RM had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(v)   On June 1, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named JO and JO that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to JO and JO. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of JO and JO despite the fact that – to the extent JO and JO had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(vi)   On August 7, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named JC and KC that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to JC and KC. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of JC and KC despite the fact that – to the extent JC and KC had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(vii)   On August 15, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual

Insureds named DC and LC that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to DC and LC. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of DC and LC despite the fact that – to the extent DC and LC had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(viii)   On September 25, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named AL and VT that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to AL and VT. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of AL and VT despite the fact that – to the extent AL and VT had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(ix)   On September 27, 2017, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named KR and YR that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to KR and YR. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of KR and YR despite the fact that – to the extent KR and YR had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(x)   On January 3, 2018, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named IC and HG that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to IC and HG. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of IC and HG despite the fact that – to the extent IC and HG had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xi)   On February 21, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named IR and ZS that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to IR and ZS. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of IR and ZS despite the fact that – to the extent IR and ZS had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xii)   On April 17, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named JG and AM that Gomez-Cortes purported to perform,

and thereby represented that they had provided "detailed" physical examinations to JG and AM. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of JG and AM despite the fact that – to the extent JG and AM had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xiii)  On May 2, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named RN, IR, and YA that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to RN, IR, and YA. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of RN, IR, and YA despite the fact that – to the extent RN, IR, and YA had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xiv)  On September 7, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named AB and JG that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to AB and JG. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of AB and JG despite the fact that – to the extent AB and JG had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xv)  On September 13, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named LE and LP that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to LE and LP. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of LE and LP despite the fact that – to the extent LE and LP had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xvi)  On September 21, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named MR and AZ that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to MR and AZ. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of MR and AZ despite the fact that – to the extent MR and AZ had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xvii)  On February 20, 2019, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named JG and ML that Gomez-Cortes purported to perform, and thereby

represented that they had provided "detailed" physical examinations to JG and ML. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of JG and ML despite the fact that – to the extent JG and ML had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xviii)   On March 13, 2019, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named YC and VD that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to YC and VD. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of YC and VD despite the fact that – to the extent YC and VD had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xix)   On March 13, 2019, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named YV and GH that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to YV and GH. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of YV and GH despite the fact that – to the extent YV and GH had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(xx)   On March 25, 2019, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named IF and RF that Gomez-Cortes purported to perform, and thereby represented that they had provided "detailed" physical examinations to IF and RF. However, Gomez-Cortes did not document an extended examination of the musculoskeletal systems of IF and RF despite the fact that – to the extent IF and RF had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

178.   Similarly, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

179.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

180.    The CPT Assistant recognizes the following organ systems

(i)      constitutional symptoms (<u>e.g.</u>, fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)   allergic/immunologic.

181.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (<u>e.g.</u>, swelling, varicosities) and palpation (<u>e.g.</u>, pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

182.    In many of the claims for initial examinations identified in Exhibits "4" – "5", when Wellness Healthcare, J. Cabrera, T. Hernandez, Gomez-Cortes, N. Fernandez, Restorative Therapy, R. Diaz, and Castellanos billed for the initial examinations under CPT code 99204, they falsely represented that Gomez-Cortes performed "comprehensive" patient examinations on the Insureds he purported to treat during the initial examinations.

183.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibits "4" – "5", neither Gomez-Cortes nor any other physician associated with Wellness Healthcare or Restorative Therapy ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

184.    For instance, in each of the claims under CPT code 99204 identified in Exhibits "4" – "5", neither Gomez-Cortes nor any other physician associated with Wellness Healthcare or Restorative Therapy ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

82

185.     Furthermore, although Gomez-Cortes often purported to provide an examination of the Insureds' musculoskeletal systems in many of the claims for initial examinations identified in Exhibits "4" – "5", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (<u>e.g.</u>, swelling, varicosities) and palpation (<u>e.g.</u>, pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (<u>e.g.</u>, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

186.     For example:

(i)      On November 2, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named GP and IP that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to GP and IP. However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the

Insureds' other organ systems

(ii)    On November 10, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named GA and YA that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to GA and YA. However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems

(iii)    On June 23, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for three initial examinations of three individual Insureds named BF, CF, and EF that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to BF, CF, and EF. However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems

(iv)    On July 26, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named JF and NH that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to JF and NH. However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems

(v)    On January 24, 2017, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named WC and MC that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to WC and MC. However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems

(vi)    On December 29, 2017, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named DC and JR that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to DC and JR. However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(vii)   On January 17, 2018, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named TM and LP that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to TM and LP.  However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(viii)   On January 23, 2018, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO under CPT code 99204 for three initial examinations of three individual Insureds named JL, RV, and NV that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to JL, RV, and NV.  However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(ix)   On April 23, 2018, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named EC and NG that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to EC and NG.  However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(x)   On October 9, 2018, Wellness Healthcare, T. Hernandez, N. Fernandez, and Gomez-Cortes billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named LG and JS that Gomez-Cortes purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to LG and JS.  However, Gomez-Cortes did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

187.   These are only representative examples. In virtually all of the claims for initial examinations under CPT code 99203 or 99204 that are identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health falsely represented

that they had provided "detailed" or "comprehensive" physical examinations, when in fact they had not.

188.    In virtually all of the claims for initial examinations under CPT code 99203 or 99204 that are identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health falsely represented that they had provided "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203 or 99204, respectively, because examinations billable under CPT code 99203 or 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" or "comprehensive" physical examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

189.    Furthermore, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

190.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination engaged in "low complexity" medical decision-making.

191.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant

complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

192.    As set forth above, pursuant to the CPT Assistant, the presenting problems that could require moderately complex medical decision-making, and therefore support the use of CPT code 99204 to bill for an initial examination, typically are problems that pose a threat to the patient's life or a serious threat to their health.

193.    Similarly, pursuant to the CPT Assistant, the presenting problems that could require low complexity medical decision-making, and therefore support the use of CPT code 99203 to bill for an initial examination, typically are chronic and relatively serious problems, or else acute problems requiring immediate invasive treatment.

194.    As set forth above, and in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health billed for the putative initial patient examinations using CPT codes 99204 or 99203, and thereby represented that Gomez-Cortes engaged in some genuine, moderate or low-complexity medical decision-making during the initial examinations.

195.    In fact, to the extent that the Insureds in the claims identified in Exhibits "2" – "8" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

196.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate, low-complexity – much less moderate complexity – medical decision-making.

197.     First, in Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health's claims for initial examinations identified in Exhibits "2" – "8", the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

198.     When the Insureds in the claims identified in Exhibits "2" – "8" presented to Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health for "treatment", they almost never arrived with any medical records.

199.     Furthermore, prior to the initial examinations, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health neither requested any medical records from any other providers, nor conducted any complex diagnostic tests beyond the basic range of motion and muscle strength testing that is attendant to any physical examination.

200.     Second, in Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health's claims for initial examinations identified in Exhibits "2" – "8", there was no risk of significant complications or morbidity – much less mortality – from the

Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

201. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health, to the extent that Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health provided any such diagnostic procedures or treatment options in the first instance.

202. In virtually every one of the claims identified in Exhibits "2" – "8", any diagnostic procedures and "treatments" that Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health actually provided were limited to a series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health- or life-threatening if properly administered.

203. Third, in the claims for initial examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health did not consider

any significant number of diagnoses or treatment options for Insureds during the initial examinations.

204.     Rather, to the extent that the initial examinations were conducted in the first instance, Gomez-Cortes, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health – at the direction of the Collazo, Perez, J. Cabrera, T. Hernandez, R. Diaz, Dreke, Aleman, and/or I. Cabrera – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

205.     Specifically, in almost every instance in the claims identified in Exhibits "2" – "8", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

206.     Even so, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

207.     Then, based upon these phony "diagnoses", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health directed virtually every Insured to return to Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health three to four times each week for medically unnecessary physical therapy during the first two to three weeks of "treatment".

208.     For example:

(i)      On July 27, 2015, an Insured named BR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BR's vehicle was drivable following the accident. The police report further indicated that BR was not injured and did not complain of any pain at the scene. In keeping with the fact that BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as the result of the accident, they were of low severity  On August 4, 2015, Gomez-Cortez purported to conduct an initial examination of BR at Health and Wellness. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided BR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BR's presenting problems, nor the treatment plan provided to BR by Gomez-Cortez, Perez, and Health and Wellness presented any risk of significant complications, morbidity, or mortality. To the contrary, BR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Perez, and Health and Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to BR. Even so, Gomez-Cortez, Perez, and Health and Wellness billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On September 25, 2015, an Insured named DR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DR's vehicle was drivable following the accident. The police report further indicated that DR was not injured and did not complain of any pain at the scene. In keeping with the fact that DR was not seriously injured, DR did not visit any hospital emergency room following the accident. To the extent that DR experienced any health problems at all as the result of the accident, they were of low severity. On September 30, 2015, Gomez-Cortez purported to conduct an initial examination of DR at Pain Relief Clinic. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided DR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DR's presenting problems, nor the treatment plan provided to DR by

91

Gomez-Cortez, Collazo, and Pain Relief Clinic presented any risk of significant complications, morbidity, or mortality. To the contrary, DR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Collazo, and Pain Relief Clinic consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DR. Even so, Gomez-Cortez, Collazo, and Pain Relief Clinic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)   On January 5, 2016, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as the result of the accident, they were of low severity. On January 7, 2016, Gomez-Cortez purported to conduct an initial examination of AA at Health and Wellness. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided AA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AA's presenting problems, nor the treatment plan provided to AA by Gomez-Cortez, Perez, and Health and Wellness presented any risk of significant complications, morbidity, or mortality. To the contrary, AA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Perez, and Health and Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AA. Even so, Gomez-Cortez, Perez, and Health and Wellness billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)   On March 23, 2016, an Insured named JJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JJ's vehicle was drivable following the accident. The police report further indicated that JJ was not injured and did not complain of any pain at the scene. In keeping with the fact that JJ was not seriously injured, JJ did not visit any hospital emergency room following the accident. To the extent that JJ experienced any health problems at all as the result of the accident, they were of low severity.  On March 23, 2016, Gomez-Cortez purported to conduct an initial examination of JJ at Pain Relief Clinic. To the extent that Gomez-Cortez

performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided JJ with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JJ's presenting problems, nor the treatment plan provided to JJ by Gomez-Cortez, Collazo, and Pain Relief Clinic presented any risk of significant complications, morbidity, or mortality. To the contrary, JJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Collazo, and Pain Relief Clinic consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JJ. Even so, Gomez-Cortez, Collazo, and Pain Relief Clinic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On June 2, 2016, an Insured named RF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RF's vehicle was drivable following the accident. The police report further indicated that RF was not injured and did not complain of any pain at the scene. In keeping with the fact that RF was not seriously injured, RF did not visit any hospital emergency room following the accident. To the extent that RF experienced any health problems at all as the result of the accident, they were of low severity. On June 7, 2016, Gomez-Cortez purported to conduct an initial examination of RF at Health and Wellness. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided RF with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RF's presenting problems, nor the treatment plan provided to RF by Gomez-Cortez, Perez, and Health and Wellness presented any risk of significant complications, morbidity, or mortality. To the contrary, RF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Perez, and Health and Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RF. Even so, Gomez-Cortez, Perez, and Health and Wellness billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On June 22, 2016, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact

collision, and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured and did not complain of any pain at the scene. In keeping with the fact that MD was not seriously injured, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as the result of the accident, they were of low severity. On July 1, 2016, Gomez-Cortez purported to conduct an initial examination of MD at Restorative Therapy. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided MD with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MD's presenting problems, nor the treatment plan provided to MD by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy presented any risk of significant complications, morbidity, or mortality. To the contrary, MD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MD. Even so, Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)    On August 18, 2016, an Insured named RV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RV's vehicle was drivable following the accident. The police report further indicated that RV was not injured and did not complain of any pain at the scene. In keeping with the fact that RV was not seriously injured, RV did not visit any hospital emergency room following the accident. To the extent that RV experienced any health problems at all as the result of the accident, they were of low severity.  On August 24, 2016, Gomez-Cortez purported to conduct an initial examination of RV at Pain Relief Clinic. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided RV with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RV's presenting problems, nor the treatment plan provided to RV by Gomez-Cortez, Collazo, and Pain Relief Clinic presented any risk of significant complications, morbidity, or mortality. To the contrary, RV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Collazo, and Pain Relief Clinic consisted of

medically unnecessary physical therapy services, which did not pose the least bit of risk to RV. Even so, Gomez-Cortez, Collazo, and Pain Relief Clinic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On October 14, 2016, an Insured named YY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that YY's vehicle was drivable following the accident. The police report further indicated that YY was not injured and did not complain of any pain at the scene. In keeping with the fact that YY was not seriously injured, YY did not visit any hospital emergency room following the accident. To the extent that YY experienced any health problems at all as the result of the accident, they were of low severity. On October 27, 2016, Gomez-Cortez purported to conduct an initial examination of YY at Restorative Therapy. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided YY with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YY's presenting problems, nor the treatment plan provided to YY by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy presented any risk of significant complications, morbidity, or mortality. To the contrary, YY did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YY. Even so, Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)    On October 31, 2016, an Insured named TM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TM's vehicle was drivable following the accident. The police report further indicated that TM was not injured and did not complain of any pain at the scene. In keeping with the fact that TM was not seriously injured, TM did not visit any hospital emergency room following the accident. To the extent that TM experienced any health problems at all as the result of the accident, they were of low severity. On November 1, 2016, Gomez-Cortez purported to conduct an initial examination of TM at Wellness Healthcare. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the

examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided TM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TM's presenting problems, nor the treatment plan provided to TM by Gomez-Cortez, J. Cabrera, and Wellness Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, TM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, J. Cabrera, and Wellness Healthcare consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to TM. Even so, Gomez-Cortez, J. Cabrera, and Wellness Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)     On January 6, 2017, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JF's vehicle was drivable following the accident. The police report further indicated that JF was not injured and did not complain of any pain at the scene. In keeping with the fact that JF was not seriously injured, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as the result of the accident, they were of low severity. On January 9, 2017, Gomez-Cortez purported to conduct an initial examination of JF at Wellness Healthcare. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided JF with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JF's presenting problems, nor the treatment plan provided to JF by Gomez-Cortez, J. Cabrera, and Wellness Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, JF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, J. Cabrera, and Wellness Healthcare consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JF. Even so, Gomez-Cortez, J. Cabrera, and Wellness Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)    On January 24, 2017, an Insured named OG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that OG's vehicle was drivable following the accident. The police report further indicated that OG was not injured and did not complain of

any pain at the scene. In keeping with the fact that OG was not seriously injured, OG did not visit any hospital emergency room following the accident. To the extent that OG experienced any health problems at all as the result of the accident, they were of low severity. On January 25, 2017, Gomez-Cortez purported to conduct an initial examination of OG at Health and Wellness. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided OG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither OG s presenting problems, nor the treatment plan provided to OG by Gomez-Cortez, Perez, and Health and Wellness presented any risk of significant complications, morbidity, or mortality. To the contrary, OG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Perez, and Health and Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to OG. Even so, Gomez-Cortez, Perez, and Health and Wellness billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)   On April 18, 2017, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as the result of the accident, they were of low severity. On April 19, 2017, Gomez-Cortez purported to conduct an initial examination of MH at Wellness Healthcare. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided MH with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MH's presenting problems, nor the treatment plan provided to MH by Gomez-Cortez, J. Cabrera, and Wellness Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, MH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, J. Cabrera, and Wellness Healthcare consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MH. Even so, Gomez-Cortez, J. Cabrera, and Wellness Healthcare

billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)   On May 28, 2017, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low severity. On June 8, 2017, Gomez-Cortez purported to conduct an initial examination of JG at Global Care. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided JG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JG's presenting problems, nor the treatment plan provided to JG by Gomez-Cortez, Dreke, De-Feria, and Global Care presented any risk of significant complications, morbidity, or mortality. To the contrary, JG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Dreke, De-Feria, and Global Care consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JG. Even so, Gomez-Cortez, Dreke, De-Feria, and Global Care billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)   On June 14, 2017, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GC was not injured and did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To the extent that GC experienced any health problems at all as the result of the accident, they were of low severity. On June 15, 2017, Gomez-Cortez purported to conduct an initial examination of GC at Restorative Therapy. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided GC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GC's presenting problems, nor the treatment plan provided to GC by

Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy presented any risk of significant complications, morbidity, or mortality. To the contrary, GC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to GC. Even so, Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xv)     On August 5, 2017, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that KC's vehicle was drivable following the accident. The police report further indicated that KC was not injured and did not complain of any pain at the scene. In keeping with the fact that KC was not seriously injured, KC did not visit any hospital emergency room following the accident. To the extent that KC experienced any health problems at all as the result of the accident, they were of low severity. On August 7, 2017, Gomez-Cortez purported to conduct an initial examination of KC at Global Care. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided KC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither KC's presenting problems, nor the treatment plan provided to KC by Gomez-Cortez, Dreke, De Feria, and Global Care presented any risk of significant complications, morbidity, or mortality. To the contrary, KC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Dreke, De Feria, and Global Care consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to KC. Even so, Gomez-Cortez, Dreke, De Feria, and Global Care billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvi)    On October 1, 2017, an Insured named OL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that OL's vehicle was drivable following the accident. The police report further indicated that OL was not injured and did not complain of any pain at the scene. In keeping with the fact that OL was not seriously injured, OL did not visit any hospital emergency room following the accident. To the extent that OL experienced any health problems at all as the result of the accident, they were of low severity. On October 12, 2017, Gomez-Cortez purported to conduct an initial examination of OL at Restorative Therapy. To the

extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided OL with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither OL's presenting problems, nor the treatment plan provided to OL by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy presented any risk of significant complications, morbidity, or mortality. To the contrary, OL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to OL. Even so, Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xvii)  On December 6, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low severity. On December 7, 2017, Gomez-Cortez purported to conduct an initial examination of AS at Global Care. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided AS with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AS's presenting problems, nor the treatment plan provided to AS by Gomez-Cortez, Dreke, De Feria, and Global Care presented any risk of significant complications, morbidity, or mortality. To the contrary, AS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Dreke, De Feria, and Global Care consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AS. Even so, Gomez-Cortez, Dreke, De Feria, and Global Care billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xviii)   On January 16, 2018, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ER's vehicle was drivable following the accident. The police report further indicated that ER was not injured and did not complain of any pain at the scene. In keeping with the fact that ER was not seriously injured, ER did not visit any hospital emergency room following the accident. To the extent that ER experienced any health problems at all as the result of the accident, they were of low severity. On January 18, 2018, Gomez-Cortez purported to conduct an initial examination of ER at Global Care. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided ER with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ER's presenting problems, nor the treatment plan provided to ER by Gomez-Cortez, Dreke, De-Feria, and Global Care presented any risk of significant complications, morbidity, or mortality. To the contrary, ER did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Dreke, De-Feria, and Global Care consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to ER. Even so, Gomez-Cortez, Dreke, De-Feria, and Global Care billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xix)   On January 29, 2018, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low severity. On January 31, 2018, Gomez-Cortez purported to conduct an initial examination of MM at Wellness Healthcare. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided MM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MM's presenting problems, nor the treatment plan provided to MM by Gomez-Cortez, T. Hernandez, and Wellness Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, MM did not

need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, T. Hernandez, and Wellness Healthcare consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MM. Even so, Gomez-Cortez, T. Hernandez, and Wellness Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xx)    On February 9, 2018, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as the result of the accident, they were of low severity. On February 15, 2018, Gomez-Cortez purported to conduct an initial examination of YM at Restorative Therapy. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided YM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YM's presenting problems, nor the treatment plan provided to YM by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy presented any risk of significant complications, morbidity, or mortality. To the contrary, YM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YM. Even so, Gomez-Cortez, R. Diaz, Franco, and Restorative Therapy billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxi)   On May 15, 2018, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ML's vehicle was drivable following the accident. The police report further indicated that ML was not injured and did not complain of any pain at the scene. In keeping with the fact that ML was not seriously injured, ML did not visit any hospital emergency room following the accident. To the extent that ML experienced any health problems at all as the result of the accident, they were of low severity. On May 16, 2018, Gomez-Cortez purported to conduct an initial examination of ML at Health and Wellness. To the extent that Gomez-Cortez performed the examination in the first instance,

Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided ML with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ML's presenting problems, nor the treatment plan provided to ML by Gomez-Cortez, Perez, and Health and Wellness presented any risk of significant complications, morbidity, or mortality. To the contrary, ML did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Perez, and Health and Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to ML. Even so, Gomez-Cortez, Perez, and Health and Wellness billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxii)    On June 5, 2018, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low severity. On June 6, 2018, Gomez-Cortez purported to conduct an initial examination of LP at Pain Relief Clinic. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided LP with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LP's presenting problems, nor the treatment plan provided to LP by Gomez-Cortez, Collazo, and Pain Relief Clinic presented any risk of significant complications, morbidity, or mortality. To the contrary, LP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Collazo, and Pain Relief Clinic consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LP. Even so, Gomez-Cortez, Collazo, and Pain Relief Clinic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxiii)   On July 24, 2018, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low severity. On July 25, 2018, Gomez-Cortez purported to conduct an initial examination of LP at Palmetto Health. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided LP with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LP's presenting problems, nor the treatment plan provided to LP by Gomez-Cortez, Aleman, and Palmetto Health presented any risk of significant complications, morbidity, or mortality. To the contrary, LP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Aleman, and Palmetto Health consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LP. Even so, Gomez-Cortez, Aleman, and Palmetto Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxiv)   On July 29, 2018, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that LD's vehicle was drivable following the accident. The police report further indicated that LD was not injured and did not complain of any pain at the scene. In keeping with the fact that LD was not seriously injured, LD did not visit any hospital emergency room following the accident. To the extent that LD experienced any health problems at all as the result of the accident, they were of low severity.  On July 31, 2018, Gomez-Cortez purported to conduct an initial examination of LD at Doctor Max. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided LD with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LD's presenting problems, nor the treatment plan provided to LD by Gomez-Cortez, Aleman, I. Cabrera, Leva, and Doctor Max presented any risk of significant complications, morbidity, or mortality. To the contrary, LD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Aleman, I. Cabrera, Leva, and Doctor Max consisted of medically unnecessary physical

therapy services, which did not pose the least bit of risk to LD. Even so, Gomez-Cortez, Aleman, I. Cabrera, Leva, and Doctor Max billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxv)   On August 22, 2018, an Insured named EG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that EG's vehicle was drivable following the accident. The police report further indicated that EG was not injured and did not complain of any pain at the scene. In keeping with the fact that EG was not seriously injured, EG did not visit any hospital emergency room following the accident. To the extent that EG experienced any health problems at all as the result of the accident, they were of low severity. On August 23, 2018, Gomez-Cortez purported to conduct an initial examination of EG at Palmetto Health. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided EG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EG's presenting problems, nor the treatment plan provided to EG by Gomez-Cortez, Aleman, and Palmetto Health presented any risk of significant complications, morbidity, or mortality. To the contrary, EG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Aleman, and Palmetto Health consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to EG. Even so, Gomez-Cortez, Aleman, and Palmetto Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxvi)  On October 9, 2018, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain at the scene. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of the accident, they were of low severity. On October 10, 2018, Gomez-Cortez purported to conduct an initial examination of JS at Wellness Healthcare. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number

of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided JS with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JS's presenting problems, nor the treatment plan provided to JS by Gomez-Cortez, T. Hernandez, N. Fernandez, and Wellness Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, JS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, T. Hernandez, N. Fernandez, and Wellness Healthcare consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JS. Even so, Gomez-Cortez, T. Hernandez, N. Fernandez, and Wellness Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxvii) On November 11, 2018, an Insured named WM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that WM's vehicle was drivable following the accident. The police report further indicated that WM was not injured and did not complain of any pain at the scene. In keeping with the fact that WM was not seriously injured, WM did not visit any hospital emergency room following the accident. To the extent that WM experienced any health problems at all as the result of the accident, they were of low severity. On November 13, 2018, Gomez-Cortez purported to conduct an initial examination of WM at Palmetto Health. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided WM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither WM's presenting problems, nor the treatment plan provided to WM by Gomez-Cortez, Aleman, and Palmetto Health presented any risk of significant complications, morbidity, or mortality. To the contrary, WM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Aleman, and Palmetto Health consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to WM. Even so, Gomez-Cortez, Aleman, and Palmetto Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxviii) On February 10, 2019, an Insured named YA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that YA's vehicle was drivable following the accident. The police report further indicated that YA was not injured and did not complain

of any pain at the scene. In keeping with the fact that YA was not seriously injured, YA did not visit any hospital emergency room following the accident. To the extent that YA experienced any health problems at all as the result of the accident, they were of low severity. On February 12, 2019, Gomez-Cortez purported to conduct an initial examination of YA at Palmetto Health. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided YA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YA's presenting problems, nor the treatment plan provided to YA by Gomez-Cortez, Aleman, and Palmetto Health presented any risk of significant complications, morbidity, or mortality. To the contrary, YA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Aleman, and Palmetto Health consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YA. Even so, Gomez-Cortez, Aleman, and Palmetto Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxix) On February 15, 2019, an Insured named YD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YD's vehicle was drivable following the accident. The police report further indicated that YD was not injured and did not complain of any pain at the scene. In keeping with the fact that YD was not seriously injured, YD did not visit any hospital emergency room following the accident. To the extent that YD experienced any health problems at all as the result of the accident, they were of low severity. On February 19, 2019, Gomez-Cortez purported to conduct an initial examination of YD at Doctor Max. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided YD with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YD's presenting problems, nor the treatment plan provided to YD by Gomez-Cortez, Aleman, I. Cabrera, Leva, and Doctor Max presented any risk of significant complications, morbidity, or mortality. To the contrary, YD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Aleman, I. Cabrera, Leva, and Doctor Max consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YD. Even so, Gomez-Cortez, Aleman, I. Cabrera, Leva, and

Doctor Max billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxx)   On March 23, 2019, an Insured named IF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain at the scene. In keeping with the fact that IF was not seriously injured, IF did not visit any hospital emergency room following the accident. To the extent that IF experienced any health problems at all as the result of the accident, they were of low severity. On March 25, 2019, Gomez-Cortez purported to conduct an initial examination of IF at Palmetto Health. To the extent that Gomez-Cortez performed the examination in the first instance, Gomez-Cortez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gomez-Cortez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gomez-Cortez provided IF with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither IF's presenting problems, nor the treatment plan provided to IF by Gomez-Cortez, Aleman, and Palmetto Health presented any risk of significant complications, morbidity, or mortality. To the contrary, IF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gomez-Cortez, Aleman, and Palmetto Health consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to IF. Even so, Gomez-Cortez, Aleman, and Palmetto Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gomez-Cortez engaged in some legitimate, low complexity medical decision-making during the purported examination.

209.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

210.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

211.   As set forth above, in the claims identified in Exhibits "2" – "8", virtually all of the Insureds whom Gomez-Cortes, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health purported to

treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

212.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "2" – "8" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

213.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

214.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "2" – "8" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, requiring a substantially identical course of treatment, on the exact same date after their underlying automobile accident.

215.    Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Gomez-Cortes, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health – at the direction of Collazo, Perez, J. Cabrera, T. Hernandez, R. Diaz, Dreke, Aleman, and/or I. Cabrera – frequently issued substantially identical, phony "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

216.    For example:

(i)     On October 19, 2013, two Insureds – MJ and JM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Pain Relief Clinic for initial examinations by Gomez-Cortes on the <u>exact same date</u>, October 31, 2013. MJ and JM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MJ and JM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Pain Relief Clinic and Gomez-Cortes – at the direction of Collazo – provided MJ and JM with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii)    On February 18, 2014, two Insureds – YC and CM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Pain Relief Clinic for initial examinations by Gomez-Cortes on the <u>exact same date</u>, February 19, 2014. YC and CM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YC and CM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Pain Relief Clinic and Gomez-Cortes – at the direction of Collazo – provided YC and CM with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iii)   On September 7, 2014, two Insureds – AB and PB – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Health and Wellness for initial examinations by Gomez-Cortes on the <u>exact same date</u>, September 11, 2014. AB and PB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AB and PB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Health and Wellness and Gomez-Cortes – at the direction of Franco and Perez – provided AB and PB with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iv)    On January 5, 2016, two Insureds – AA and RG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Health and Wellness for initial examinations by Gomez-Cortes on the <u>exact same date</u>, January 7, 2016. AA and RG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AA and RG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Health and Wellness and Gomez-Cortes – at the direction of Franco and Perez – provided AA and RG with substantially identical, phony soft tissue injury "diagnoses", and recommended a

substantially identical course of medically unnecessary treatment to both of them.

(v)     On August 18, 2016, two Insureds – WS and RV – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Pain Relief Clinic for initial examinations by Gomez-Cortes on the <u>exact same date</u>, August 24, 2016. WS and RV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that WS and RV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Pain Relief Clinic and Gomez-Cortes – at the direction of Collazo – provided WS and RV with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(vi)    On November 2, 2016, two Insureds – JF and EG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Wellness Healthcare for initial examinations by Gomez-Cortes on the <u>exact same date</u>, November 3, 2016. JF and EG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JF and EG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Wellness Healthcare and Gomez-Cortes – at the direction of J. Cabrera – provided JF and EG with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(vii)   On November 9, 2016, two Insureds – AR and JT – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Health and Wellness for initial examinations by Gomez-Cortes on the <u>exact same date</u>, November 10, 2016. AR and JT were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AR and JT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Health and Wellness and Gomez-Cortes – at the direction of Franco and Perez – provided AR and JT with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(viii)  On January 7, 2017, two Insureds – DS and SS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Wellness Healthcare for initial examinations by Gomez-Cortes on the <u>exact same date</u>, January 10, 2017. DS and SS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DS and SS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Wellness Healthcare and

Gomez-Cortes – at the direction of J. Cabrera – provided DS and SS with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ix)     On January 14, 2017, two Insureds – OG and RM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Health and Wellness for initial examinations by Gomez-Cortes on the <u>exact same date</u>, January 25, 2017. OG and RM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that OG and RM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Health and Wellness and Gomez-Cortes – at the direction of Franco and Perez – provided OG and RM with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(x)      On September 28, 2017, two Insureds – MD and AS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Wellness Healthcare for initial examinations by Gomez-Cortes on the <u>exact same date</u>, September 29, 2017. MD and AS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MD and AS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Wellness Healthcare and Gomez-Cortes – at the direction of T. Hernandez – provided MD and AS with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xi)     On February 17, 2018, two Insureds – IR and ZS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Doctor Max for initial examinations by Gomez-Cortes on the <u>exact same date</u>, February 18, 2018. IR and ZS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IR and ZS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Doctor Max and Gomez-Cortes – at the direction of Aleman, I. Cabrera, and Leva – provided IR and ZS with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xii)    On March 4, 2018, two Insureds – RF and FM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Wellness Healthcare for initial examinations by Gomez-Cortes on the <u>exact same date</u>, March 12, 2018. RF and FM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RF and FM

suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Wellness Healthcare and Gomez-Cortes – at the direction of T. Hernandez – provided RF and FM with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xiii)   On March 13, 2018, two Insureds – MC and CG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Restorative Therapy for initial examinations by Gomez-Cortes on the <u>exact same date</u>, March 15, 2018. MC and CG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MC and CG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Restorative Therapy and Gomez-Cortes – at the direction of R. Diaz and Franco – provided MC and CG with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xiv)   On May 4, 2018, two Insureds – OB and MF – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Restorative Therapy for initial examinations by Gomez-Cortes on the <u>exact same date</u>, May 8, 2018. OB and MF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that OB and MF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Restorative Therapy and Gomez-Cortes – at the direction of R. Diaz and Franco – provided OB and MF with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xv)   On May 11, 2018, two Insureds – AH and RP – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Restorative Therapy for initial examinations by Gomez-Cortes on the <u>exact same date</u>, May 17, 2018. AH and RP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AH and RP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Restorative Therapy and Gomez-Cortes – at the direction of R. Diaz and Franco – provided AH and RP with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xvi)   On July 11, 2018, two Insureds – YG and CM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Palmetto Health for initial examinations by Gomez-Cortes on the <u>exact same date</u>, July 13, 2018. YG and CM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YG and CM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Palmetto Health and Gomez-Cortes – at the direction of Aleman– provided YG and CM with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xvii)   On July 29, 2018, three Insureds – LD, MM, and CP – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Doctor Max for initial examinations by Gomez-Cortes on the <u>exact same date</u>, July 31, 2018. LD, MM, and CP were all different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LD, MM, and CP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Doctor Max and Gomez-Cortes – at the direction of Aleman, I. Cabrera, and Leva – provided LD, MM, and CP with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xviii)   On August 22, 2018, two Insureds – EG and ER – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Palmetto Health for initial examinations by Gomez-Cortes on the <u>exact same date</u>, August 23, 2018. EG and ER were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EG and ER suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Palmetto Health and Gomez-Cortes – at the direction of Aleman– provided EG and ER with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xix)   On September 20, 2018, two Insureds – MR and AZ – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Doctor Max for initial examinations by Gomez-Cortes on the <u>exact same date</u>, September 21, 2018. MR and AZ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MR and AZ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Doctor Max and Gomez-Cortes – at the direction of Aleman, I. Cabrera, , and Leva – provided MR and AZ with

substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xx)    On December 3, 2018, three Insureds – RL, UL, and FT – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Restorative Therapy for initial examinations by Gomez-Cortes on the <u>exact same date</u>, December 4, 2018. RL, UL, and FT were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RL, UL, and FT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Restorative Therapy and Gomez-Cortes – at the direction of R. Diaz and Franco – provided RL, UL, and FT with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xxi)   On March 23, 2019, two Insureds – IF and RF – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Palmetto Health for initial examinations by Gomez-Cortes on the <u>exact same date</u>, March 25, 2019. IF and RF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IF and RF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Palmetto Health and Gomez-Cortes – at the direction of Aleman– provided IF and RF with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xxii)  On April 26, 2019, two Insureds – FC and MG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Restorative Therapy for initial examinations by Gomez-Cortes on the <u>exact same date</u>, April 30, 2019. FC and MG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FC and MG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Restorative Therapy and Gomez-Cortes – at the direction of Castellanos and Franco – provided FC and MG with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

217.    Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto

Health routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

218.    In the claims for initial examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health also routinely falsely represented that the initial examinations involved medical decision-making of low or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require low or moderate complexity medical decision-making.

219.    In the claims for initial examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

**2.      The Fraudulent Charges for Follow-Up Examinations**

220.    In addition to their fraudulent initial examinations, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health virtually always purported to subject each of the Insureds in the claims identified in Exhibits "2" – "8" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

221.    Gomez-Cortes purported to personally perform a substantial majority of the follow-up examinations in the claims identified in Exhibits "2" – "8".

222.    As set forth in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health then billed many of the purported follow-up examinations through Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health to GEICO under: (i) CPT code 99214, virtually always resulting in a charge of between $205.00 and $370.00 for each

putative follow-up examination; or (ii) CPT code 99213, virtually always resulting in a charge of between $135.00 and $200.00 for each putative follow-up examination.

223. In the claims for follow-up examinations identified in Exhibits "2" – "8", the charges for the follow-up examinations were fraudulent in that they misrepresented Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health's eligibility to collect PIP Benefits in the first instance.

224. In fact, and as set forth below, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health were never eligible to collect PIP Benefits, inasmuch as they were operated in violation of the licensing and operating requirements set forth in the Clinic Act.

225. As set forth below, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health's charges for the follow-up examinations identified in Exhibits "2" – "8" also were fraudulent in that they misrepresented the nature and extent of the follow-up examinations.

a. **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

226. Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

227. The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of moderate to high severity, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination, specifically:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)      Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)   Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

228.    Accordingly, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

229.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

230.    The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination, specifically:

(i)      Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

231.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

232.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "2" – "8" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

233.    Ordinary soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

234.    By the time the Insureds in the claims identified in Exhibits "2" – "8" presented at Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, or Palmetto Health for the putative follow-up examinations, the Insureds either did

not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

235.    Even so, in the claims for follow-up examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely billed for their putative follow-up examinations under CPT codes 99214 and 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity at the time of the purported follow-up examinations.

236.    For example:

(i)      On September 25, 2015, an Insured named DR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DR's vehicle was drivable following the accident. The police report further indicated that DR was not injured and did not complain of any pain at the scene. In keeping with the fact that DR was not seriously injured, DR did not visit any hospital emergency room following the accident. To the extent that DR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of DR on November 18, 2015, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for the follow up examination using CPT code 99214 and thereby falsely represented that DR presented with problems of moderate to high severity.

(ii)     On March 7, 2016, an Insured named KA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that KA's vehicle was drivable following the accident. The police report further indicated that KA was not injured and did not complain of any pain at the scene. In keeping with the fact that KA was not seriously injured, KA did not visit any hospital emergency room following the accident. To the extent that KA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of KA on May 7, 2016, Health and

Wellness, Perez, Gomez-Cortes, and Franco billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that KA presented with problems of low to moderate severity.

(iii)   On June 2, 2016, an Insured named RF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RF's vehicle was drivable following the accident. The police report further indicated that RF was not injured and did not complain of any pain at the scene. In keeping with the fact that RF was not seriously injured, RF did not visit any hospital emergency room following the accident. To the extent that RF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of RF on August 25, 2016, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that RF presented with problems of moderate to high severity.

(iv)   On June 22, 2016, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of JR on September 13, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that JR presented with problems of moderate to high severity.

(v)   On August 18, 2016, an Insured named RV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RV's vehicle was drivable following the accident. The police report further indicated that RV was not injured and did not complain of any pain at the scene. In keeping with the fact that RV was not seriously injured, RV did not visit any hospital emergency room following the accident. To the extent that RV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of RV on September 21, 2016, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that RV presented with problems of low to moderate severity.

(vi)     On October 31, 2016, an Insured named DM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DM's vehicle was drivable following the accident. The police report further indicated that DM was not injured and did not complain of any pain at the scene. In keeping with the fact that DM was not seriously injured, DM did not visit any hospital emergency room following the accident. To the extent that DM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of DM on January 23, 2017, Wellness Healthcare, J. Cabrera and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that DM presented with problems of low to moderate severity.

(vii)    On January 7, 2017, an Insured named ID was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that ID's vehicle was drivable following the accident. The police report further indicated that ID was not injured and did not complain of any pain at the scene. In keeping with the fact that ID was not seriously injured, ID did not visit any hospital emergency room following the accident. To the extent that ID experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of ID on March 9, 2017, Health and Wellness, Perez, Gomez-Cortes, and Franco billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that ID presented with problems of low to moderate severity.

(viii)   On January 21, 2017, an Insured named EB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that EB's vehicle was drivable following the accident. The police report further indicated that EB was not injured and did not complain of any pain at the scene. In keeping with the fact that EB was not seriously injured, EB did not visit any hospital emergency room following the accident. To the extent that EB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of EB on March 7, 2017, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that EB presented with problems of moderate to high severity.

(ix)     On April 18, 2017, an Insured named LL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LL's vehicle was drivable following the accident. The police report further indicated that LL was not injured and did not complain

of any pain at the scene. In keeping with the fact that LL was not seriously injured, LL did not visit any hospital emergency room following the accident. To the extent that LL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of LL on May 16, 2017, Wellness Healthcare, J. Cabrera and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that LL presented with problems of low to moderate severity.

(x)     On May 14, 2017, an Insured named BR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BR's vehicle was drivable following the accident. The police report further indicated that BR was not injured and did not complain of any pain at the scene. In keeping with the fact that BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of BR on July 5, 2017, Pain Relief Clinic, Collazo, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that BR presented with problems of low to moderate severity.

(xi)    On July 10, 2017, an Insured named CF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that CF's vehicle was drivable following the accident. The police report further indicated that CF was not injured and did not complain of any pain at the scene. In keeping with the fact that CF was not seriously injured, CF did not visit any hospital emergency room following the accident. To the extent that CF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of CF on August 17, 2016, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that CF presented with problems of moderate to high severity.

(xii)   On September 27, 2017, an Insured named NL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NL's vehicle was drivable following the accident. The police report further indicated that NL was not injured and did not complain of any pain at the scene. In keeping with the fact that NL was not seriously injured, NL did not visit any hospital emergency room following the accident. To the extent that NL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and

either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of NL on December 11, 2017, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that NL presented with problems of low to moderate severity.

(xiii)   On September 28, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of AS on December 1, 2017, Wellness Healthcare, T. Hernandez, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that AS presented with problems of low to moderate severity.

(xiv)   On January 16, 2018, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of MG on March 26, 2018, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that MG presented with problems of low to moderate severity.

(xv)   On May 17, 2018, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of JM on June 21, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely

represented that MM presented with problems of low to moderate severity.

(xvi) On May 21, 2018, an Insured named FG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FG's vehicle was drivable following the accident. The police report further indicated that FG was not injured and did not complain of any pain at the scene. In keeping with the fact that FG was not seriously injured, FG did not visit any hospital emergency room following the accident. To the extent that FG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of FG on August 9, 2018, Global Care, Dreke, De Feria, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that FG presented with problems of low to moderate severity.

(xvii) On July 24, 2018, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of LP on August 28, 2018, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that LP presented with problems of low to moderate severity.

(xviii) On September 25, 2018, an Insured named JG was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, JG's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that JG was not seriously injured in the minor accident, JG did not visit any hospital following the accident. To the extent that JG suffered any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of JG by Gomez-Cortes on October 30, 2018, Doctor Max, Aleman, I. Cabrera, Leva, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that JG presented with problems of low to moderate severity.

(xix)   On August 23, 2018, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LD's vehicle was drivable following the accident. The police report further indicated that LD was not injured and did not complain of any pain at the scene. In keeping with the fact that LD was not seriously injured, LD did not visit any hospital emergency room following the accident. To the extent that LD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of LD on September 19, 2018, Restorative Therapy, R. Diaz, Franco, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that LD presented with problems of moderate to high severity.

(xx)    On November 11, 2018, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time of the purported follow-up examination. Even so, following a purported follow-up examination of JL on January 15, 2019, Palmetto Health, Aleman, and Gomez-Cortes billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that JL presented with problems of low to moderate severity.

237.   In the claims for follow-up examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99214 and 99213, because follow-up examinations billable under CPT codes 99214 and 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

238.    In the claims for follow-up examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and physical therapy.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

239.    What is more, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents that the examining physician performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused" physical examination; and (iii) engaged in medical decision-making of "low complexity".

240.    Similarly, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents that the examining physician performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

241.    In actuality, though Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely billed for Gomez-Cortes' purported follow-up examinations using CPT codes 99213 or 99214, Gomez-Cortes did not take any legitimate

patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

242.    Rather, following the purported follow-up examinations, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) caused the Insureds to be referred for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

243.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health purported to provide a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibits "2" – "8", irrespective of the Insureds' actual presenting problems, to the extent the Insureds suffered any legitimate injuries at all.

244.    Specifically, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative

Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health caused virtually every Insured to receive two to five months of purported physical therapy treatments, typically beginning with daily physical therapy for the first two to three weeks of treatment, followed by physical therapy four times per week for the subsequent four weeks, followed by physical therapy three times a week for the final four weeks.

245.    In addition, Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health caused virtually every Insured to receive substantially identical types of physical therapy services, including: (i) hot/cold packs; (ii) mechanical traction; (iii) electrical stimulation; (iv) contrast baths; (v) ultrasound therapy; (vi) therapeutic exercises; and (vii) neuromuscular reeducation. See Exhibits "2" – "8".

246.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

247.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

248.    By contrast, at Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, or Palmetto Health, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no

legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.

249.    The phony "follow-up examinations" that Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health purported to provide the Insureds in the claims identified in Exhibits "2" – "8" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the Defendants' offices.

250.    In the claims for follow-up examinations identified in Exhibits "2" – "8", Pain Relief Clinic, Collazo, Gomez-Cortes, Health and Wellness, Perez, Franco, Wellness Healthcare, J. Cabrera, T. Hernandez, N. Fernandez, Restorative Therapy, R. Diaz, Castellanos, Global Care, Dreke, De Feria, Doctor Max, Aleman, I. Cabrera, Leva, and Palmetto Health routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    as set forth below, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health never were eligible to collect PIP Benefits in connection with the examinations in the first

instance, inasmuch as they unlawfully were operated without legitimate medical directors.

**3.      The Fraudulent Charges for Physical Therapy**

251.    In addition to the fraudulent initial examinations and follow-up examinations, the Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibits "1" – "8"to between two and five months of medically unnecessary physical therapy.

252.    As set forth above, although Gomez-Cortes falsely purported to personally perform or directly supervise the substantial majority of the physical therapy services in the claims identified in Exhibits "1" – "8", the physical therapy services actually were performed by massage therapists or unlicensed individuals associated with the Clinic Defendants, without any supervision by any physician or physical therapist, to the extent that they were even provided at all.

253.    In the claims for physical therapy services identified in Exhibits "1" – "8", the charges for the physical therapy services were fraudulent in that they misrepresented the Clinic Defendants' eligibility to collect PIP Benefits in the first instance.

254.    In fact, and as set forth herein, the Clinic Defendants were never eligible to collect PIP Benefits, inasmuch as they were operated in violation of the licensing and operating requirements set forth in the Clinic Act.

255.    What is more, and as set forth herein, in the claims for physical therapy services identified in Exhibits "1" – "8", the Defendants falsely represented that the therapy services lawfully had been performed or directly supervised by Gomez-Cortes, when in fact they were unlawfully performed by unsupervised massage therapists or other unlicensed individuals associated with the Clinic Defendants, who are not and never have been licensed as physical therapists.

256.    Additionally, none of the massage therapists or unlicensed individuals associated with the Clinic Defendants was directly supervised by Gomez-Cortes when performing the physical therapy services identified in Exhibits "1" – "8".

257.    Moreover, pursuant to Florida law, massage therapists cannot lawfully perform physical therapy services unless they also are licensed as physical therapists. See Fla. Stat. § 486.028.

258.    As a result, beginning in at least 2013, the Clinic Defendants and Clinic Owner Defendants falsely listed Gomez-Cortes as the treating provider on a substantial majority of the bills that they purported to provide through the Clinic Defendants, including every individual physical therapy service that was billed through the Clinic Defendants, identified in Exhibits "1" – "8".

259.    In fact, and as set forth above, Gomez-Cortes did not perform any of the physical therapy services that were billed through the Clinic Defendants to GEICO and other insurers, including but not limited to the services billed through the Clinic Defendants between 2013 and the present.

260.    Gomez-Cortes could not physically have performed, or even supervised, the massive number of therapy services that were billed through the Clinic Defendants to GEICO after 2013.

261.    Even so, the Defendants routinely falsely represented in the billing they submitted through the Clinic Defendants to GEICO for physical therapy services after 2013 that Gomez-Cortes personally performed the underlying physical therapy services, when in fact the services had been performed by unsupervised massage therapists or unlicensed individuals associated with the Clinic Defendants, to the extent that they were performed at all.

262.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

263.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

264.    In each of the claims for physical therapy services identified in Exhibits "1" – "8", the Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

265.     In fact, in the claims for physical therapy services identified in Exhibits "1" – "8", the services were not lawfully provided and were not eligible for PIP reimbursement, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – by unsupervised massage therapists or unlicensed individuals associated with the Clinic Defendants, who were individuals who were not licensed to practice physical therapy; and (ii) the Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the therapy services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

## III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

266.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through the Clinic Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

267.     The claims that the Defendants submitted or caused to be submitted to GEICO

were false and misleading in the following, material respects:

(i)      The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they were operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services, because they were provided by unsupervised massage therapists and other unlicensed individuals in contravention of Florida law.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement the Defendants could unlawfully obtain.

IV.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

268.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

269.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

270.    For instance, the Defendants knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery that the Clinic Defendants lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance.

271.    What is more, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided – to the extent that they were provided at all – by unsupervised massage therapists and other unlicensed individuals in contravention of Florida law.

272.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

273.    Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

274.    The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

275.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $7,000,000.00.

276.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
**Against Fernandez Medical, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

277.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

278.    There is an actual case in controversy between GEICO and the Clinic Defendants regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

279.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of the Clinic Act's medical director and operating requirements

280.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

281.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

282.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

283.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

284.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

285.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Fernandez Medical, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health have no right to receive payment for any pending bills submitted to GEICO

## SECOND CAUSE OF ACTION
### Against M. Fernandez and Gomez-Cortes
### (Violation of RICO, 18 U.S.C. § 1962(c))

286.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

287.    Fernandez Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

288.    M. Fernandez and Gomez-Cortes knowingly have conducted and/or participated, directly or indirectly, in the conduct of Fernandez Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Fernandez Medical was not eligible to receive under the No-Fault Law because: (i) Fernandez Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Fernandez Medical, M. Fernandez, Gomez-Cortes, and Martinez (the "Fernandez Medical Defendants"), rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

289.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

290.     Fernandez Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which M. Fernandez and Gomez-Cortes operated Fernandez Medical, inasmuch as Fernandez Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Fernandez Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Fernandez Medical Defendants continue to attempt collection on the fraudulent billing submitted through Fernandez Medical to the present day.

291.     Fernandez Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Fernandez Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

292.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $735,000.00 pursuant to the fraudulent bills submitted through the Fernandez Medical enterprise.

293.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against M. Fernandez, Gomez-Cortes, and Martinez**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

294.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

295.    Fernandez Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

296.    M. Fernandez, Gomez-Cortes, and Martinez are or were employed by or associated with the Fernandez Medical enterprise.

297.    M. Fernandez, Gomez-Cortes, and Martinez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Fernandez Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Fernandez Medical was not eligible to receive under the No-Fault Law because: (i) Fernandez Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Fernandez Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented

and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

298.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

299.    M. Fernandez, Gomez-Cortes, and Martinez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

300.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $735,000.00 pursuant to the fraudulent bills submitted through the Fernandez Medical enterprise.

301.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against the Fernandez Medical Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

302.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

303.    The Fernandez Medical Defendants are actively engaged in trade and commerce in the State of Florida.

304.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

305.    The Fernandez Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

306.    The bills and supporting documents submitted or caused to be submitted by the Fernandez Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) Fernandez Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

307.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Fernandez Medical Defendants has been materially injurious to GEICO and its Insureds.

308.    The conduct of the Fernandez Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

309.    The Fernandez Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $735,000.00.

310.    By reason of the Fernandez Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against M. Fernandez, Gomez-Cortes, and Martinez**
**(Under Fla. Stat. 772.103 et. seq.)**

311.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

143

312.     In furtherance of the fraudulent scheme, M. Fernandez, Gomez-Cortes, and Martinez submitted or caused to be submitted thousands of fraudulent charges through the Fernandez Medical enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

313.     When the billing was submitted M. Fernandez, Gomez-Cortes, and Martinez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Fernandez Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Fernandez Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

314.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

315.     This pattern of criminal activity resulted in M. Fernandez, Gomez-Cortes, and Martinez receiving more than $735,000.00 in PIP Benefits to which they were not entitled.

316. M. Fernandez, Gomez-Cortes, and Martinez's pattern of criminal activity has caused GEICO to sustain damages of at least $735,000.00.

317. By reason of M. Fernandez, Gomez-Cortes, and Martinez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**SIXTH CAUSE OF ACTION**
**Against the Fernandez Medical Defendants**
**(Common Law Fraud)**

318. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

319. The Fernandez Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Fernandez Medical for the Fraudulent Services.

320. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Fernandez Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Fernandez Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in

many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

321.    The Fernandez Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Fernandez Medical that were not reimbursable.

322.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $735,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Fernandez Medical Defendants through Fernandez Medical.

323.    The Fernandez Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

324.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against the Fernandez Medical Defendants**
**(Unjust Enrichment)**

325.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-276 above.

326.    As set forth above, the Fernandez Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

327.    When GEICO paid the bills and charges submitted or caused to be submitted by the Fernandez Medical Defendants through Fernandez Medical, it reasonably believed that it was legally obligated to make such payments based on the Fernandez Medical Defendants' improper, unlawful, and/or unjust acts.

328.    The Fernandez Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Fernandez Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

329.    The Fernandez Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

330.    By reason of the above, the Fernandez Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $735,000.00.

### EIGHTH CAUSE OF ACTION
**Against Collazo and Gomez-Cortes**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

331.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

332.    Pain Relief Clinic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

333.    Collazo and Gomez-Cortes knowingly have conducted and/or participated, directly or indirectly, in the conduct of Pain Relief Clinic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Pain Relief Clinic was not eligible to receive under the No-Fault Law because: (i) Pain Relief

Clinic unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Pain Relief Clinic, Collazo, and Gomez-Cortes (collectively the "Pain Relief Clinic Defendants"), rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

334.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

335.    Pain Relief Clinic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Collazo and Gomez-Cortes operated Pain Relief Clinic, inasmuch as Pain Relief Clinic was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Pain Relief Clinic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Pain Relief Clinic Defendants continue to attempt collection on the fraudulent billing submitted through Pain Relief Clinic to the present day.

336.     Pain Relief Clinic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Pain Relief Clinic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

337.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,050,000.00 pursuant to the fraudulent bills submitted through the Pain Relief Clinic enterprise.

338.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
### Against Collazo and Gomez-Cortes
### (Violation of RICO, 18 U.S.C. § 1962(d))

339.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

340.     Pain Relief Clinic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

341.     Collazo and Gomez-Cortes are or were employed by or associated with the Pain Relief Clinic enterprise.

342.     Collazo and Gomez-Cortes knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Pain Relief Clinic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause

to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Pain Relief Clinic was not eligible to receive under the No-Fault Law because: (i) Pain Relief Clinic unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Pain Relief Clinic Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

343. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

344. Collazo and Gomez-Cortes knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

345. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,050,000.00 pursuant to the fraudulent bills submitted through the Pain Relief Clinic enterprise.

346.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against the Pain Relief Clinic Defendants
### (Under Fla. Stat. 501.201 et. seq.)

347.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

348.    The Pain Relief Clinic Defendants are actively engaged in trade and commerce in the State of Florida.

349.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

350.    The Pain Relief Clinic Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

351.    The bills and supporting documents submitted or caused to be submitted by the Pain Relief Clinic Defendants to GEICO were fraudulent in that they misrepresented: (i) Pain Relief Clinic's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

352.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Pain Relief Clinic Defendants has been materially injurious to GEICO and its Insureds.

353.    The conduct of the Pain Relief Clinic Defendants was the actual and proximate cause of the damages sustained by GEICO.

354.    The Pain Relief Clinic Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,050,000.00.

355.    By reason of the Pain Relief Clinic Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## ELEVENTH CAUSE OF ACTION
### Against Collazo and Gomez-Cortes
### (Under Fla. Stat. 772.103 et. seq.)

356.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

357.    In furtherance of the fraudulent scheme, Collazo and Gomez-Cortes submitted or caused to be submitted thousands of fraudulent charges through the Pain Relief Clinic enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

358.    When the billing was submitted Collazo and Gomez-Cortes knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Pain Relief Clinic unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Pain Relief Clinic Defendants,

rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

359.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

360.    This pattern of criminal activity resulted in Collazo and Gomez-Cortes receiving more than $1,050,000.00 in PIP Benefits to which they were not entitled.

361.    Collazo and Gomez-Cortes's pattern of criminal activity has caused GEICO to sustain damages of at least $1,050,000.00.

362.    By reason of Collazo and Gomez-Cortes's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWELFTH CAUSE OF ACTION**
**Against the Pain Relief Clinic Defendants**
**(Common Law Fraud)**

363.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

364.    The Pain Relief Clinic Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Pain Relief Clinic for the Fraudulent Services.

365.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Pain Relief Clinic was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Pain Relief Clinic never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

366.    The Pain Relief Clinic Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Pain Relief Clinic that were not reimbursable.

367.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,050,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Pain Relief Clinic Defendants through Pain Relief Clinic.

368.    The Pain Relief Clinic Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

369.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
### Against the Pain Relief Clinic Defendants
### (Unjust Enrichment)

370.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-276 above.

371.     As set forth above, the Pain Relief Clinic Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

372.     When GEICO paid the bills and charges submitted or caused to be submitted by the Pain Relief Clinic Defendants through Pain Relief Clinic, it reasonably believed that it was legally obligated to make such payments based on the Pain Relief Clinic Defendants' improper, unlawful, and/or unjust acts.

373.     The Pain Relief Clinic Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Pain Relief Clinic Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

374.     The Pain Relief Clinic Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

375.     By reason of the above, the Pain Relief Clinic Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,050,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against Perez and Franco
### (Violation of RICO, 18 U.S.C. § 1962(c))

376.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

377.    Health and Wellness is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

378.    Perez and Franco knowingly have conducted and/or participated, directly or indirectly, in the conduct of Health and Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Health and Wellness was not eligible to receive under the No-Fault Law because: (i) Health and Wellness unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Health and Wellness, Perez, Franco, and Gomez-Cortes (collectively the "Health and Wellness Defendants") rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

379.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

380.     Health and Wellness's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Perez and Franco operated Health and Wellness, inasmuch as Health and Wellness was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Health and Wellness to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Health and Wellness Defendants continue to attempt collection on the fraudulent billing submitted through Health and Wellness to the present day.

381.     Health and Wellness is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Health and Wellness in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

382.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted through the Health and Wellness enterprise.

383.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Perez, Franco, and Gomez-Cortes
### (Violation of RICO, 18 U.S.C. § 1962(d))

384.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

385.    Health and Wellness is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

386.    Perez, Franco, and Gomez-Cortes are or were employed by or associated with the Health and Wellness enterprise.

387.    Perez, Franco, and Gomez-Cortes knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Health and Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Health and Wellness was not eligible to receive under the No-Fault Law because: (i) Health and Wellness unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Health and Wellness Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented

and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

388.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

389.    Perez, Franco, and Gomez-Cortes knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

390.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted through the Health and Wellness enterprise.

391.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against the Health and Wellness Defendants
### (Under Fla. Stat. 501.201 et. seq.)

392.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

393.    The Health and Wellness Defendants are actively engaged in trade and commerce in the State of Florida.

394.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

395.     The Health and Wellness Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

396.     The bills and supporting documents submitted or caused to be submitted by the Health and Wellness Defendants to GEICO were fraudulent in that they misrepresented: (i) Health and Wellness's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

397.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Health and Wellness Defendants has been materially injurious to GEICO and its Insureds.

398.     The conduct of the Health and Wellness Defendants was the actual and proximate cause of the damages sustained by GEICO.

399.     The Health and Wellness Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,300,000.00.

400.     By reason of the Health and Wellness Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**SEVENTEENTH CAUSE OF ACTION**
**Against Perez, Franco, and Gomez-Cortes**
**(Under Fla. Stat. 772.103 et. seq.)**

401.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

160

402.     In furtherance of the fraudulent scheme, Perez, Franco, and Gomez-Cortes submitted or caused to be submitted thousands of fraudulent charges through the Health and Wellness enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

403.     When the billing was submitted Perez, Franco, and Gomez-Cortes knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Health and Wellness unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Health and Wellness Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

404.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

405.     This pattern of criminal activity resulted in Perez, Franco, and Gomez-Cortes' receiving more than $1,300,000.00 in PIP Benefits to which they were not entitled.

406.    Perez, Franco, and Gomez-Cortes' pattern of criminal activity has caused GEICO to sustain damages of at least $1,300,000.00.

407.    By reason of Perez, Franco, and Gomez-Cortes' conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**EIGHTEENTH CAUSE OF ACTION**
**Against the Health and Wellness Defendants**
**(Common Law Fraud)**

408.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

409.    The Health and Wellness Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Health and Wellness for the Fraudulent Services.

410.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Health and Wellness was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Health and Wellness never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in

many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

411. The Health and Wellness Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Health and Wellness that were not reimbursable.

412. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Health and Wellness Defendants through Health and Wellness.

413. The Health and Wellness Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

414. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against the Health and Wellness Defendants
### (Unjust Enrichment)

415. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-276 above.

416. As set forth above, the Health and Wellness Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

417.    When GEICO paid the bills and charges submitted or caused to be submitted by the Health and Wellness Defendants through Health and Wellness, it reasonably believed that it was legally obligated to make such payments based on the Health and Wellness Defendants' improper, unlawful, and/or unjust acts.

418.    The Health and Wellness Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Health and Wellness Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

419.    The Health and Wellness Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

420.    By reason of the above, the Health and Wellness Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,300,000.00.

**TWENTIETH CAUSE OF ACTION**
**Against J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

421.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

422.    Wellness Healthcare is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

423.    J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez knowingly have conducted and/or participated, directly or indirectly, in the conduct of Wellness Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Wellness Healthcare was not eligible to receive under the No-Fault Law

because: (i) Wellness Healthcare unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Wellness Healthcare, J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez (collectively the "Wellness Healthcare Defendants"), rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

424.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

425.    Wellness Healthcare's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which J. Cabrera, T. Hernandez, and Gomez-Cortes operated Wellness Healthcare, inasmuch as Wellness Healthcare was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Wellness Healthcare to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Wellness Healthcare Defendants continue to attempt collection on the fraudulent billing submitted through Wellness Healthcare to the present day.

426. Wellness Healthcare is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Wellness Healthcare in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

427. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $850,000.00 pursuant to the fraudulent bills submitted through the Wellness Healthcare enterprise.

428. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION**
**Against J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

429. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

430. Wellness Healthcare is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

431. J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez are or were employed by or associated with the Wellness Healthcare enterprise.

432. J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Wellness Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the

United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Wellness Healthcare was not eligible to receive under the No-Fault Law because: (i) Wellness Healthcare unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Wellness Healthcare Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

433.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

434.   J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

435.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $850,000.00 pursuant to the fraudulent bills submitted through the Wellness Healthcare enterprise.

436.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-SECOND OF ACTION**
**Against the Wellness Healthcare Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

437.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

438.    The Wellness Healthcare Defendants are actively engaged in trade and commerce in the State of Florida.

439.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

440.    The Wellness Healthcare Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

441.    The bills and supporting documents submitted or caused to be submitted by the Wellness Healthcare Defendants to GEICO were fraudulent in that they misrepresented: (i) Wellness Healthcare's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

442.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Wellness Healthcare Defendants has been materially injurious to GEICO and its Insureds.

443.    The conduct of the Wellness Healthcare Defendants was the actual and proximate cause of the damages sustained by GEICO.

444.    The Wellness Healthcare Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $850,000.00.

445.    By reason of the Wellness Healthcare Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### TWENTY-THIRD CAUSE OF ACTION
**Against J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez**
**(Under Fla. Stat. 772.103 et. seq.)**

446.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

447.    In furtherance of the fraudulent scheme, J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez submitted or caused to be submitted thousands of fraudulent charges through the Wellness Healthcare enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

448.    When the billing was submitted J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Wellness Healthcare unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the

Wellness Healthcare Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

449. These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

450. This pattern of criminal activity resulted in J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez's receiving more than $850,000.00 in PIP Benefits to which they were not entitled.

451. J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez's pattern of criminal activity has caused GEICO to sustain damages of at least $850,000.00.

452. By reason of J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### TWENTY-FOURTH CAUSE OF ACTION
### Against the Wellness Healthcare Defendants
### (Common Law Fraud)

453. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

454. The Wellness Healthcare Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Wellness Healthcare for the Fraudulent Services.

455.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Wellness Healthcare was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Wellness Healthcare never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

456.     The Wellness Healthcare Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Wellness Healthcare that were not reimbursable.

457.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $850,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Wellness Healthcare Defendants through Wellness Healthcare.

458.     The Wellness Healthcare Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

459.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
**Against the Wellness Healthcare Defendants**
**(Unjust Enrichment)**

460.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-276 above.

461.    As set forth above, the Wellness Healthcare Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

462.    When GEICO paid the bills and charges submitted or caused to be submitted by the Wellness Healthcare Defendants through Wellness Healthcare, it reasonably believed that it was legally obligated to make such payments based on the Wellness Healthcare Defendants' improper, unlawful, and/or unjust acts.

463.    The Wellness Healthcare Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Wellness Healthcare Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

464.    The Wellness Healthcare Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

465.    By reason of the above, the Wellness Healthcare Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $850,000.00.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against R. Diaz, Castellanos, and Franco**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

466.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

467.     Restorative Therapy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

468.     R. Diaz, Castellanos, and Franco knowingly have conducted and/or participated, directly or indirectly, in the conduct of Restorative Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Restorative Therapy was not eligible to receive under the No-Fault Law because: (i) Restorative Therapy unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Restorative Therapy R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo (collectively the "Restorative Therapy Defendants") rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

469.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

470.    Restorative Therapy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Castellanos and Gomez-Cortes operated Restorative Therapy, inasmuch as Restorative Therapy was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Restorative Therapy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Restorative Therapy Defendants continue to attempt collection on the fraudulent billing submitted through Restorative Therapy to the present day.

471.    Restorative Therapy is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Restorative Therapy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

472.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $800,000.00 pursuant to the fraudulent bills submitted through the Restorative Therapy enterprise.

473.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo
### (Violation of RICO, 18 U.S.C. § 1962(d))

474.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

475.    Restorative Therapy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

476.    R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo are or were employed by or associated with the Restorative Therapy enterprise.

477.    R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Restorative Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Restorative Therapy was not eligible to receive under the No-Fault Law because: (i) Restorative Therapy unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Restorative Therapy Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the

underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

478.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

479.    R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

480.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $800,000.00 pursuant to the fraudulent bills submitted through the Restorative Therapy enterprise.

481.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-EIGHT CAUSE OF ACTION
**Against the Restorative Therapy Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

482.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

483.    The Restorative Therapy Defendants are actively engaged in trade and commerce in the State of Florida.

484.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

485.     The Restorative Therapy Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

486.     The bills and supporting documents submitted or caused to be submitted by the Restorative Therapy Defendants to GEICO were fraudulent in that they misrepresented: (i) Restorative Therapy's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

487.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Restorative Therapy Defendants has been materially injurious to GEICO and its Insureds.

488.     The conduct of the Restorative Therapy Defendants was the actual and proximate cause of the damages sustained by GEICO.

489.     The Restorative Therapy Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $800,000.00.

490.     By reason of the Restorative Therapy Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TWENTY-NINTH CAUSE OF ACTION
### Against R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo
### (Under Fla. Stat. 772.103 et. seq.)

491.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

492.    In furtherance of the fraudulent scheme, R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo submitted or caused to be submitted thousands of fraudulent charges through the Restorative Therapy enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

493.    When the billing was submitted R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Restorative Therapy unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Restorative Therapy Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

494.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

495.    This pattern of criminal activity resulted in Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo receiving more than $800,000.00 in PIP Benefits to which they were not entitled.

496.     R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo's pattern of criminal activity has caused GEICO to sustain damages of at least $800,000.00.

497.     By reason of R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**THIRTIETH CAUSE OF ACTION**
**Against the Restorative Therapy Defendants**
**(Common Law Fraud)**

498.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

499.     The Restorative Therapy Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Restorative Therapy for the Fraudulent Services.

500.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Restorative Therapy was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Restorative Therapy never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in

many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

501.    The Restorative Therapy Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Restorative Therapy that were not reimbursable.

502.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $800,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Restorative Therapy Defendants through Restorative Therapy.

503.    The Restorative Therapy Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

504.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY-FIRST CAUSE OF ACTION
### Against the Restorative Therapy Defendants
### (Unjust Enrichment)

505.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-276 above.

506.    As set forth above, the Restorative Therapy Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

507.     When GEICO paid the bills and charges submitted or caused to be submitted by the Restorative Therapy Defendants through Restorative Therapy, it reasonably believed that it was legally obligated to make such payments based on the Restorative Therapy Defendants' improper, unlawful, and/or unjust acts.

508.     The Restorative Therapy Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Restorative Therapy Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

509.     The Restorative Therapy Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

510.     By reason of the above, the Restorative Therapy Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $800,000.00.

**THIRTY-SECOND CAUSE OF ACTION**
**Against Dreke and De Feria**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

511.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

512.     Global Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

513.     Dreke and De Feria knowingly have conducted and/or participated, directly or indirectly, in the conduct of Global Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Global Care was not eligible to receive under the No-Fault Law because: (i) Global Care unlawfully was operated in

violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Global Care, Dreke, De Feria, M. Lopez, and Gomez-Cortes (collectively the "Global Care Defendants") rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

514. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

515. Global Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dreke and Gomez-Cortes operated Global Care, inasmuch as Global Care was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Global Care to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Global Care Defendants continue to attempt collection on the fraudulent billing submitted through Global Care to the present day.

516. Global Care is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.

These inherently unlawful acts are taken by Global Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

517.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $430,000.00 pursuant to the fraudulent bills submitted through the Global Care enterprise.

518.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRTY-THIRD CAUSE OF ACTION**
**Against Dreke, De Feria, Gomez-Cortes, and M. Lopez**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

519.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

520.     Global Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

521.     Dreke, De Feria, Gomez-Cortes, and M. Lopez are or were employed by or associated with the Global Care enterprise.

522.     Dreke, De Feria, Gomez-Cortes, and M. Lopez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Global Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Global Care was not eligible to receive under the No-Fault Law because: (i) Global Care unlawfully was operated in violation of the Clinic Act's medical

director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Global Care Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

523.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

524.    Dreke, De Feria, Gomez-Cortes, and M. Lopez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

525.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $430,000.00 pursuant to the fraudulent bills submitted through the Global Care enterprise.

526.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-FOURTH CAUSE OF ACTION
### Against the Global Care Defendants
### (Under Fla. Stat. 501.201 et. seq.)

527.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

528.    The Global Care Defendants are actively engaged in trade and commerce in the State of Florida.

529.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

530.    The Global Care Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

531.    The bills and supporting documents submitted or caused to be submitted by the Global Care Defendants to GEICO were fraudulent in that they misrepresented: (i) Global Care's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

532.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Global Care Defendants has been materially injurious to GEICO and its Insureds.

533.    The conduct of the Global Care Defendants was the actual and proximate cause of the damages sustained by GEICO.

534.    The Global Care Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $430,000.00.

535.    By reason of the Global Care Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**THIRTY-FIFTH CAUSE OF ACTION**
**Against Dreke, De Feria, Gomez-Cortes, and M. Lopez**
**(Under Fla. Stat. 772.103 et. seq.)**

536.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

537.    In furtherance of the fraudulent scheme, Dreke, De Feria, Gomez-Cortes, and M. Lopez submitted or caused to be submitted thousands of fraudulent charges through the Global Care enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

538.    When the billing was submitted Dreke, De Feria, Gomez-Cortes, Y. Hernandez, and Gallo knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Global Care unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Global Care Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services

misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

539.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

540.    This pattern of criminal activity resulted in Dreke, De Feria, Gomez-Cortes, and M. Lopez receiving more than $430,000.00 in PIP Benefits to which they were not entitled.

541.    Dreke, De Feria, Gomez-Cortes, and M. Lopez's pattern of criminal activity has caused GEICO to sustain damages of at least $430,000.00.

542.    By reason of Dreke, De Feria, Gomez-Cortes, and M. Lopez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**THIRTY-SIXTH CAUSE OF ACTION**
**Against the Global Care Defendants**
**(Common Law Fraud)**

543.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

544.    The Global Care Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Global Care for the Fraudulent Services.

545.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Global Care was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Global Care never was in compliance with the Clinic Act, and never was eligible to collect

PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

546.    The Global Care Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Global Care that were not reimbursable.

547.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $430,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Global Care Defendants through Global Care.

548.    The Global Care Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

549.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-SEVENTH CAUSE OF ACTION**
**Against the Global Care Defendants**
**(Unjust Enrichment)**

550.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-276 above.

551.    As set forth above, the Global Care Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

552.    When GEICO paid the bills and charges submitted or caused to be submitted by the Global Care Defendants through Global Care, it reasonably believed that it was legally obligated to make such payments based on the Global Care Defendants' improper, unlawful, and/or unjust acts.

553.    The Global Care Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Global Care Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

554.    The Global Care Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

555.    By reason of the above, the Global Care Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $430,000.00.

**THIRTY-EIGHTH CAUSE OF ACTION**
**Against Aleman, I. Cabrera, and Leva**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

556.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

557.    Doctor Max is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

558.     Aleman, I. Cabrera, and Leva knowingly have conducted and/or participated, directly or indirectly, in the conduct of Doctor Max's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Doctor Max was not eligible to receive under the No-Fault Law because: (i) Doctor Max unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Doctor Max, Aleman, I. Cabrera, Gomez-Cortes, Herrera, Simon, and M. Lopez (collectively the "Doctor Max Defendants") rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

559.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

560.     Doctor Max's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Aleman and Gomez-Cortes operated Doctor Max, inasmuch as Doctor Max was not engaged in a legitimate health care practice, and acts of mail fraud therefore were

essential in order for Doctor Max to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Doctor Max Defendants continue to attempt collection on the fraudulent billing submitted through Doctor Max to the present day.

561.    Doctor Max is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Doctor Max in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

562.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,200,000.00 pursuant to the fraudulent bills submitted through the Doctor Max enterprise.

563.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRTY-NINTH CAUSE OF ACTION
### Against Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez
### (Violation of RICO, 18 U.S.C. § 1962(d))

564.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

565.    Doctor Max is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

566.    Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez are or were employed by or associated with the Doctor Max enterprise.

567.     Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Doctor Max's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Doctor Max was not eligible to receive under the No-Fault Law because: (i) Doctor Max unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Doctor Max Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

568.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

569.     Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO

and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

570.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,200,000.00 pursuant to the fraudulent bills submitted through the Doctor Max enterprise.

571.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTIETH CAUSE OF ACTION
### Against the Doctor Max Defendants
### (Under Fla. Stat. 501.201 et. seq.)

572.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

573.     The Doctor Max Defendants are actively engaged in trade and commerce in the State of Florida.

574.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

575.     The Doctor Max Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

576.     The bills and supporting documents submitted or caused to be submitted by the Doctor Max Defendants to GEICO were fraudulent in that they misrepresented: (i) Doctor Max's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

577.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Doctor Max Defendants has been materially injurious to GEICO and its Insureds.

578.    The conduct of the Doctor Max Defendants was the actual and proximate cause of the damages sustained by GEICO.

579.    The Doctor Max Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,200,000.00.

580.    By reason of the Doctor Max Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FORTY-FIRST CAUSE OF ACTION
### Against Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez
### (Under Fla. Stat. 772.103 et. seq.)

581.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

582.    In furtherance of the fraudulent scheme, Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez submitted or caused to be submitted thousands of fraudulent charges through the Doctor Max enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

583.    When the billing was submitted Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Doctor Max unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and

therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Doctor Max Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

584.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

585.    This pattern of criminal activity resulted in Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez receiving more than $1,200,000.00 in PIP Benefits to which they were not entitled.

586.    Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez's pattern of criminal activity has caused GEICO to sustain damages of at least $1,200,000.00.

587.    By reason of Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FORTY-SECOND CAUSE OF ACTION**
**Against the Doctor Max Defendants**
**(Common Law Fraud)**

588.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

195

589.    The Doctor Max Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Doctor Max for the Fraudulent Services.

590.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Doctor Max was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Doctor Max never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

591.    The Doctor Max Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Doctor Max that were not reimbursable.

592.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,200,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Doctor Max Defendants through Doctor Max.

593.    The Doctor Max Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

594.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FORTY-THIRD CAUSE OF ACTION
### Against the Doctor Max Defendants
### (Unjust Enrichment)

595.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-276 above.

596.    As set forth above, the Doctor Max Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

597.    When GEICO paid the bills and charges submitted or caused to be submitted by the Doctor Max Defendants through Doctor Max, it reasonably believed that it was legally obligated to make such payments based on the Doctor Max Defendants' improper, unlawful, and/or unjust acts.

598.    The Doctor Max Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Doctor Max Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

599.    The Doctor Max Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

600.    By reason of the above, the Doctor Max Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,200,000.00.

**FORTY-FOURTH CAUSE OF ACTION**
**Against Aleman and Gomez-Cortes**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

601.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

602.    Palmetto Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

603.    Aleman and Gomez-Cortes knowingly have conducted and/or participated, directly or indirectly, in the conduct of Palmetto Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Palmetto Health was not eligible to receive under the No-Fault Law because: (i) Palmetto Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Palmetto Health, Aleman, Gomez-Cortes, Simon, and Torres (collectively the "Palmetto Health Defendants") rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

198

604.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8".

605.    Palmetto Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Aleman and Gomez-Cortes operated Palmetto Health, inasmuch as Palmetto Health was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Palmetto Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Palmetto Health Defendants continue to attempt collection on the fraudulent billing submitted through Palmetto Health to the present day.

606.    Palmetto Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Palmetto Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

607.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $640,000.00 pursuant to the fraudulent bills submitted through the Palmetto Health enterprise.

608.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FORTY-FIFTH CAUSE OF ACTION**
**Against Aleman, Gomez-Cortes, Simon, and Torres**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

609.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

610.     Palmetto Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

611.     Aleman, Gomez-Cortes, Simon, and Torres are or were employed by or associated with the Palmetto Health enterprise.

612.     Aleman, Gomez-Cortes, Simon, and Torres knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Palmetto Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Palmetto Health was not eligible to receive under the No-Fault Law because: (i) Palmetto Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Palmetto Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and

exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

613.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8". Each such mailing was made in furtherance of the mail fraud scheme.

614.    Aleman, Gomez-Cortes, Simon, and Torres knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

615.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $640,000.00 pursuant to the fraudulent bills submitted through the Palmetto Health enterprise.

616.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FORTY-SIXTH CAUSE OF ACTION
#### Against the Palmetto Health Defendants
#### (Under Fla. Stat. 501.201 et. seq.)

617.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

618.    The Palmetto Health Defendants are actively engaged in trade and commerce in the State of Florida.

619.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

620.    The Palmetto Health Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

621.    The bills and supporting documents submitted or caused to be submitted by the Palmetto Health Defendants to GEICO were fraudulent in that they misrepresented: (i) Palmetto Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

622.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Palmetto Health Defendants has been materially injurious to GEICO and its Insureds.

623.    The conduct of the Palmetto Health Defendants was the actual and proximate cause of the damages sustained by GEICO.

624.    The Palmetto Health Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $640,000.00.

625.    By reason of the Palmetto Health Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FORTY-SEVENTH CAUSE OF ACTION**
**Against Aleman, Gomez-Cortes, Simon, and Torres**
**(Under Fla. Stat. 772.103 et. seq.)**

626.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

627.    In furtherance of the fraudulent scheme, Aleman, Gomez-Cortes, Simon, and Torres submitted or caused to be submitted thousands of fraudulent charges through the Palmetto

Health enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

628.   When the billing was submitted Aleman, Gomez-Cortes, Simon, and Torres knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Palmetto Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Palmetto Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

629.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

630.   This pattern of criminal activity resulted in Aleman, Gomez-Cortes, Simon, and Torres receiving more than $640,000.00 in PIP Benefits to which they were not entitled.

631.   Aleman, Gomez-Cortes, Simon, and Torres' pattern of criminal activity has caused GEICO to sustain damages of at least $640,000.00.

632.     By reason of Aleman, Gomez-Cortes, Simon, and Torres' conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FORTY-EIGHTH CAUSE OF ACTION**
**Against the Palmetto Health Defendants**
**(Common Law Fraud)**

633.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-276 above.

634.     The Palmetto Health Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Palmetto Health for the Fraudulent Services.

635.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Palmetto Health was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Palmetto Health never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

636.    The Palmetto Health Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Palmetto Health that were not reimbursable.

637.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $640,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Palmetto Health Defendants through Palmetto Health.

638.    The Palmetto Health Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

639.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FORTY-NINTH CAUSE OF ACTION
### Against the Palmetto Health Defendants
### (Unjust Enrichment)

640.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-276 above.

641.    As set forth above, the Palmetto Health Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

642.    When GEICO paid the bills and charges submitted or caused to be submitted by the Palmetto Health Defendants through Palmetto Health, it reasonably believed that it was

legally obligated to make such payments based on the Palmetto Health Defendants' improper, unlawful, and/or unjust acts.

643.    The Palmetto Health Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Palmetto Health Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

644.    The Palmetto Health Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

645.    By reason of the above, the Palmetto Health Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $640,000.00.

## JURY DEMAND

646.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Fernandez Medical, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Fernandez Medical, Pain Relief Clinic, Health and Wellness, Wellness Healthcare, Restorative Therapy, Global Care, Doctor Max, and Palmetto Health have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against M. Fernandez and Gomez-Cortes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$730,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against M. Fernandez, Gomez-Cortes, and Martinez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $730,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Fernandez Medical, M. Fernandez, Gomez-Cortes, and Martinez, compensatory damages in an amount to be determined at trial but in excess of $730,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against M. Fernandez, Gomez-Cortes, and Martinez, compensatory damages in an amount to be determined at trial but in excess of $1,300.000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.      On the Sixth Cause of Action against Fernandez Medical, M. Fernandez, Gomez-Cortes, and Martinez, compensatory damages in an amount to be determined at trial but in excess of $730,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Fernandez Medical, M. Fernandez, Gomez-Cortes, and Martinez, more than $730,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Collazo and Gomez-Cortes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$1,050,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Collazo and Gomez-Cortes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,050,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Pain Relief Clinic, Collazo and Gomez-Cortes, compensatory damages in an amount to be determined at trial but in excess of $1,050,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

K.      On the Eleventh Cause of Action against Collazo and Gomez-Cortes, compensatory damages in an amount to be determined at trial but in excess of $1,050,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

L.      On the Twelfth Cause of Action against Pain Relief Clinic, Collazo and Gomez-Cortes, compensatory damages in an amount to be determined at trial but in excess of $1,050,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Pain Relief Clinic, Collazo and Gomez-Cortes, more than $1,050,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Perez and Franco, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$1,300,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.     On the Fifteenth Cause of Action against Perez, Franco, and Gomez-Cortes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.     On the Sixteenth Cause of Action against Health and Wellness, Perez, Franco, and Gomez-Cortes, compensatory damages in an amount to be determined at trial but in excess of $1,300,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Q.     On the Seventeenth Cause of Action against Perez, Franco, and Gomez-Cortes, compensatory damages in an amount to be determined at trial but in excess of $250,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

R.     On the Eighteenth Cause of Action against Health and Wellness, Perez, Franco, and Gomez-Cortes, compensatory damages in an amount to be determined at trial but in excess of $1,300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

S.     On the Nineteenth Cause of Action against Health and Wellness, Perez, Franco, and Gomez-Cortes, more than $1,300,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

T.     On the Twentieth Cause of Action against J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez, compensatory damages in favor of GEICO in an amount to be

determined at trial but in excess of $1,700,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez, compensatory damages in of GEICO in an amount to be determined at trial but in excess of $850,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Wellness Healthcare, T J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez, compensatory damages in an amount to be determined at trial but in excess of $850,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

W.      On the Twenty-Third Cause of Action against J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez, compensatory damages in an amount to be determined at trial but in excess of $850,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

X.      On the Twenty-Fourth Cause of Action against Wellness Healthcare, J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez, compensatory damages in an amount to be determined at trial but in excess of $850,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Wellness Healthcare, J. Cabrera, T. Hernandez, Gomez-Cortes, and N. Fernandez, more than $850,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.      On the Twenty-Sixth Cause of Action against R. Diaz, Castellanos, and Franco, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.    On the Twenty-Seventh Cause of Action against R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.    On the Twenty-Eighth Cause of Action against Restorative Therapy, R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo, compensatory damages in an amount to be determined at trial but in excess of $800,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

CC.    On the Twenty-Ninth Cause of Action against R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo mages in an amount to be determined at trial but in excess of $800,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

DD.    On the Thirtieth Cause of Action against Restorative Therapy, R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo, compensatory damages in an amount to be determined at trial but in excess of $800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.    On the Thirty-First Cause of Action against Restorative Therapy, R. Diaz, Castellanos, Franco, Gomez-Cortes, Y. Hernandez, and Gallo, more than $800,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

FF.     On the Thirty-Second Cause of Action against Dreke and De Feria, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,200,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.     On the Thirty-Third Cause of Action against Dreke, De Feria, Gomez-Cortes, and M. Lopez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $430,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.     On the Thirty-Fourth Cause of Action against Global Care, Dreke, De Feria, Gomez-Cortes, and M. Lopez, compensatory damages in an amount to be determined at trial but in excess of $430,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

II.     On the Thirty-Fifth Cause of Action against Dreke, De Feria, Gomez-Cortes, and M. Lopez, compensatory damages in an amount to be determined at trial but in excess of $430,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

JJ.     On the Thirty-Sixth Cause of Action against Global Care, Dreke, De Feria, Gomez-Cortes, and M. Lopez, compensatory damages in an amount to be determined at trial but in excess of $430,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

KK.     On the Thirty-Seventh Cause of Action against Global Care, Dreke, De Feria, Gomez-Cortes, and M. Lopez, more than $430,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

LL.     On the Thirty-Eight Cause of Action against Aleman and Leva, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,200,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

MM.     On the Thirty-Ninth Cause of Action against Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

NN.     On the Fortieth Cause of Action against Doctor Max, Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez, compensatory damages in an amount to be determined at trial but in excess of $800,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

OO.     On the Forty-First Cause of Action against Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez, compensatory damages in an amount to be determined at trial but in excess of $1,200,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

PP.     On the Forty-Second Cause of Action against Doctor Max, Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez, compensatory damages in an amount to be determined at trial but in excess of $1,200,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

QQ.     On the Forty-Third Cause of Action against Doctor Max, Aleman, I. Cabrera, Leva, Gomez-Cortes, Herrera, Simon, and M. Lopez, more than $1,200,000.00 in compensatory

damages, plus costs and interest and such other and further relief as this Court deems just and proper;

  RR. On the Forty-Fourth of Action against Aleman and Gomez-Cortes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $640,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  SS. On the Forty-Fifth Cause of Action against Aleman and Gomez-Cortes, Simon, and Torres, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $640,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  TT. On the Forty-Sixth Cause of Action against Palmetto Health, Aleman, Gomez-Cortes, Simon, and Torres, compensatory damages in an amount to be determined at trial but in excess of $640,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

  UU. On the Forty-Seventh Cause of Action against Aleman, Gomez-Cortes, Simon, and Torres, compensatory damages in an amount to be determined at trial but in excess of $640,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

  VV. On the Forty-Eighth Cause of Action against Palmetto Health, Aleman, Gomez-Cortes, Simon, and Torres, compensatory damages in an amount to be determined at trial but in excess of $640,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

WW.    On the Forty-Ninth Cause of Action against Palmetto Health, Aleman, Gomez-Cortes, Simon, and Torres, more than $640,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:          April 12, 2020

> /s/ John P. Marino
> John P. Marino (FBN 814539)
> Lindsey R. Trowell (FBN 678783)
> Kristen Wenger (FBN 92136)
> SMITH, GAMBRELL & RUSSELL, LLP
> 50 North Laura Street, Suite 2600
> Jacksonville, Florida 32202
> Phone:  (904) 598-6100
> Facsimile:  (904) 598-6204
> jmarino@sgrlaw.com
> ltrowell@sgrlaw.com
> kwenger@sgrlaw.com
>
> Timothy J. Bang (pro hac vice pending)
> RIVKIN RADLER LLP
> 926 RXR Plaza
> Uniondale, New York 11550
> Phone:  (516) 357-3000
> Facsimile:  (516) 357-3333
> max.gershenoff@rivkin.com
> timothy.bang@rivkin.com
>
> *Attorneys for Plaintiffs*